Major and William Alderman, plaintiffs in error, *vs.* The People, defendants in error.

## MAJOR AND WILLIAM ALDERMAN, plaintiffs in error, *vs.* THE PEOPLE, defendants in error.

A communication made to an attorney, under the impression that the attorney had consented to act as such for the party making it, is privileged, but it must be made to the attorney as the legal adviser of the party, and for the purpose of obtaining his legal opinion upon some legal right or obligation.

An accomplice who consents to become a witness for the People on the trial of his associates for the offence charged, must disclose all that he and his associates may have said or done in relation to such offence, and cannot be excused from testifying to statements made by him to his Attorney, on the ground of their being privileged communications.

To constitute an indictable conspiracy, there must be a combination of two or more persons to commit some act known as an offence at common law, or that has been declared such by statute, or an act not in itself unlawful by unlawful means.

If a conspirary be to commit an offence known as such at common law, so that by describing it by the term by which it is generally known, the nature of the offence is clearly indicated, then it will only be necessary to use such term in describing the object of the conspiracy.

If there be a combination to do an act, not in itself unlawful, but which it is agreed to accomplish by criminal or unlawful means, those means must be particularly set forth, and be such as constitute an offence, either at common law or by statute.

The gist of the offence of conspiracy, is the unlawful combination and agreement. It is not necessary to constitute the offence, that any overt act should be done in pursuance of such combination and agreement, nor that such overt act should be alleged.

"Cheating and defrauding" are punishable only when effected by false tokens or pretences. The words themselves do not impart an offence, and do not define an offence unless effected in some of the modes made criminal by statute. An indictment for conspiracy to cheat and defraud, must therefore set out the false tokens and pretences to be used in effecting the contemplated fraud.

Error to Wayne Circuit.

At the March term of the Wayne Circuit Court in 1854, the defendants were indicted, with one Henry H. Bush, for a conspiracy to defraud. They pleaded the general issue to

the indictment, and were tried and convicted at the May term, 1855. A motion for new trial, and also in arrest of judgment, was made and overruled, and sentence was passed on the Aldermans in August, 1855.

A bill of exceptions was signed in the case, which was returned with the writ of error, and special errors were assigned upon matters contained in the indictment and bill of exceptions.

The indictment in the first count, charged that the defendants, being of Oakland County, with intent to cheat and defraud the persons after named, doing business in Detroit, of their goods, on June 1, 1853, at White Lake, in Oakland County, did conspire with Bush to cheat and defraud said persons of their goods, and the value thereof; that to consummate said fraud, Bush was to convey a quantity of land owned by him, worth about $1000, and being all he had, to Major Alderman, under a pretended sale, to be held by him as the apparent owner, till Bush should transfer to him the stock of goods after mentioned ; that no real consideration was to be paid for said land ; but Alderman was to make advances to establish the credit of Bush in Detroit ; that Bush was thereupon to go to Detroit, and make as large purchases of goods as he could on credit, and take them to White Lake ; that after the goods, to prevent suspicion, had been exposed a while for sale, the whole stock which Bush might have, should be transferred to Major Alderman, under a pretended sale, in order to prevent the creditors of Bush from reaching them, or collecting anything from him ; that, as a pretended consideration for the goods, Alderman was to reconvey the land to Bush, at a price to be expressed in the deed, a good deal higher than it was worth; and in order still to prevent the creditors from reaching the land in the hands of Bush, he was to execute back to Alderman a mortgage for about what it was really worth, to secure a pretended balance

between the value of the land and the value of the goods; that after such transfer, Bush was to refuse to pay his debts, Alderman was to buy them in at a nominal rate, cheating his creditors out of the balance; and that, whatever might be finally made in the operation should be shared, one-third to Alderman, and two-thirds to Bush. That in pursuance of such conspiracy, Bush conveyed the land described to Alderman; that Alderman made advances to Bush to sustain his credit in Detroit; that Bush went to Detroit, and made large purchases of goods on credit, of divers persons, naming them; that the goods were taken to White Lake and exposed for sale; when on December 12, 1853, the whole stock was transferred to Alderman, on a pretended sale, without consideration; that Major Alderman reconveyed the land to Bush, for the expressed consideration of $2000, being a good deal more than it was worth; that Bush, to keep said land away from his creditors, gave back to Alderman a mortgage for $1000, being all the land was worth; that all the parties, Major and William Alderman, and Bush, were present at all such transactions, acting and assisting, concurring in and assenting to the same.

The second count, in substance, charged that the Aldermans and Bush, September 1, 1853, at White Lake, Oakland County, conspired to cheat and defraud certain persons in Detroit, after named, of their goods, after mentioned, and in the manner after set forth; that to accomplish such cheat, Bush was to go to Detroit, and there, on his sole account, make large purchases of goods of such persons as would trust him; that such goods were to be taken to White Lake, and there, without consideration, transferred over to Major Alderman, under a false pretence of sale, and thus defraud the persons of whom the goods might have been purchased out of the whole or much of the price thereof, by placing the property of Bush beyond the reach of creditors. That pursuant to such con-

spiracy, Bush went to Detroit, Wayne County, and made large purchases of goods, naming them and their value, of such persons as would trust him, naming the persons; that the goods were taken to White Lake, where, on December 12, 1853, said goods, and the whole stock of goods belonging to Bush, were transferred over to Major Alderman, under a pretended sale, pursuant to said conspiracy, without any real consideration; that both the Aldermans and Bush took part in all said transactions.

. The bill of exceptions was substantially as follows : That Bush was sworn as a witness for the prosecution, and testified as to where he and the defendants had resided for several years, and how long he had known them ; also, to the amount of land he owned in 1853, the condition of the title; as to the conveyance of the land to Alderman in 1853, and the consideration and object of the conveyance, how the credit of Bush was to be sustained, goods purchased, exposed for sale, and transferred to Alderman, so that the creditors of Bush could get nothing ; that the land was to be reconveyed to Bush, but covered by a mortgage to Alderman ; that Bush was to refuse to pay his creditors ; Alderman was to buy in the claims against him, and they were to devide what they could make by the operation, one-third to Alderman, and two-thirds to Bush ; that Alderman said, Bush might as well be rich as poor, and get it out of those who had enough ; and that several conversations were had about it. Alderman let Bush have some money, and signed a note for him ; that he testified as to the bills purchased from Chandler and others, in 1853 ; that Alderman told him to purchase costly articles, and at large houses ; that he took the goods purchased to White Lake, and went on with business until December, when the goods were transferred over to Alderman ; that William Alderman assisted and advised in the transfer. He testified fully how and when the transfer

53

was made, and the means used to prevent suspicion and make the transfer appear fair. Also, of conversations had, and the object of them, going to show a fair operation; that the stock of goods was worth from three to four thousand dollars; that payment was receipted; Alderman gave a deed of the lands, and Bush gave back a mortgage, and the goods were taken to Milford, and put in a store there kept by Alderman; that Bush was arrested, and Alderman advised him to run away after he got bail, and stated how much both could make by the operation; Alderman threatened him, if he turned against him. On the cross-examination, the witness went more fully into detail; not changing the substance generally of his testimony in chief. He was then asked as to a conversation had by him with Mr. Baldwin, an attorney, and testified that he had employed Baldwin as his attorney, and he had agreed to act as such. Baldwin, on being sworn, said he had declined to act for Bush. Bush further testified, that he had employed Baldwin as his counsel, had frequently advised with him; Baldwin had always assured him he would stand by him to the end; had never received any intimation from him to the contrary, and considered him his counsel, when he made the communications as to which he was questioned. The Court being of opinion, that Bush had reason to believe, and did believe, Baldwin was his counsel, refused to require Bush to give his testimony. Bush was then asked as to what he had said to Baldwin on the same occasion, which was objected to, and the witness excused from answering for the same reason.

The counsel for the accused asked the Court to instruct the jury, that the indictment did not charge a criminal offence. The Court declined so to charge, but instructed the jury, that the indictment contained a charge of a conspiracy to commit a criminal act, to which instruction the defendants excepted. The two Aldermans, upon their conviction and sentence, presented to the Judge the bill of exceptions which

Major and William Alderman, plaintiffs in error, *vs.* The People, defendants in error.

accompanied the writ of error. The errors assigned were founded upon the insufficiency of the indictment, and the above rulings of the Court.

*Wilcox & Gray*, with whom was *J. M. Howard* (retained before his election as Attorney General), for plaintiffs in error.

I. The guilt of conspiracy consists, either in the criminality, or at least the illegality of the object to be accomplished, or of the means by which it is to be accomplished. In this case, both counts aver the object of the conspiracy to be, "*to cheat and defraud sundry merchants in Detroit, and particularly those named, of their goods and property;*" that this "cheat" was to be effected by certain means, which the first count particularizes at great length. In setting them forth, the count alleges that their employment was with a view to two other and supplemental objects, to wit: "To prevent the creditors from reaching any of said goods by process of law, and thus collecting anything from Bush; and that Bush's creditors might not get hold of any of his property, from which to collect their claims." Both of which objects are quite different from the main one mentioned at the commencement of the count, viz.: "to cheat and defraud the merchants of their goods," and neither of them criminal in themselves. It will be seen, that none of the means as agreed to be used, or as actually used, are illegal, much less criminal. As neither count sets forth any *false tokens*, the Court cannot infer that a common law cheat is intended. (*People* vs. *Stone*, 9 *Wend.*, 187.)

The charge in the indictment is simply no more, than that the accused conspired to cheat and defraud the persons named, and others, of their effects, which, without showing that the means are criminal, is insufficient, as implying no crime. (*Lambert* vs. *People*, 9 *Cow.*, 578; *Com.* vs. *Hunt*,

Major and William Alderman, plaintiffs in error, *vs.* The People, defendants in error.

4 *Metc.*, 111, 125; *Com.* vs. *Hartman*, 5 *Barr's R.*, 60; *Com.* vs. *Eastman*, 1 *Cush.*, 189, 226, 227; *Com.* vs. *Shedd*, 7 *Ib.*, 514; *State* vs. *Roberts*, 34 *Maine* [4 *Red.*], 320.) The counts are therefore defective for uncertainty. (1 *Chit. Crim. L.*, 168; *People* vs. *Gates*, 13 *Wend.*, 311; *People* vs. *Taylor*, 3 *Denio*, 91; *March* vs. *People*, 7 *Barb.*, *S. C.*, 391; 2 *Burr.*, 1128.)

II. If the charge be considered as a conspiracy to commit the misdemeanor created by the "*Fraudulent Debtor's* Act" (*R. S.*, *p.* 607, *Sec.* 17), it is still defective, as no such offence is alleged to have been the object of the conspiracy. Where the criminality of the conspiracy consists in the object to be attained, the statement of the contemplated offence must be full and explicit, so that the accused may be fully notified of what he is to meet on the trial, and may be protected by the record from further prosecution. (*Com.* vs. *Hunt*, 4 *Metc.*, 111, 125; *Com.* vs. *Eastman*, 1 *Cush.*, 224, 227.)

III. The exclusion of the impeaching evidence sought to be obtained from Bush, on his cross-examination, on the ground that the statements were privileged, was erroneous. The rule is, that the privilege of the client "extends so as to include communications made by him to his legal adviser, whilst engaged in that character, *and when the object is to get his legal advice and opinion as to his legal rights and obligations.* (*Foster* vs. *Hall*, 12 *Pick.*, 89, 98, and cases there cited; 9 *Barr*, 279; 3 *Barb. Ch. R.*, 528, 596, etc.; 1 *Hill R.*, 33.) And, unless the communication was made to the attorney, "with the purpose of instructing him in any cause, or engaging him in the conduct of any professional business, or of obtaining any legal advice or opinion," the communication is not privileged. (*Hutton* vs. *Robinson*, 14 *Pick.*, 416, 421, 422; 4 *T. R.*, 432, 753; *Barnes* vs. *Harris*, 7 *Cush.*, 576).

*L. Bishop*, for the People.

Each count sets out a criminal offence. The first sets out, in detail, the intent, the conspiracy, how it was to be consummated, and the acts done in pursuance of it. The second is the same in substance as the general count for conspiracy, adding thereto the overt acts, as found in the books of precedents, and as approved by the Supreme Court of this State. (3 *Chit. Crim. L.*, 1186; 1 *Mich. R.*, 216.)

The intent to cheat and defraud, accompanied with a combination to do so, is what constitutes the offence of conspiracy. (1 *Mich.* 216; 2 *B. & Ald.*, 204; 15 *N. H.*, 396.) The object of the combination in this case was criminal, viz.: to prevent the goods from becoming liable to pay Bush's debts, and thus defraud his creditors. The object was a misdemeanor. (*R. S.* 1846, *p.* 607, *Sec.* 17; *p.* 669, *Sec.* 40; 9 *Cow.*, 612, 613, 614.) Moreover, as the principal object was to cheat and defraud creditors, and as that object was to be attained, among other means, by a disposition of property to prevent its being made liable for debts, we have a case of a combination to accomplish an object by criminal means, made such by the statute cited. The defendants are therefore charged with combining to accomplish an *object* both *unlawful* and *criminal*, and by *criminal means*, being all three of the cases stated in the books. Such an indictment clearly charges the commission of a criminal offence. (2 *Russ on C.*, 553, 561, 562; 3 *Greenl. Ev.*, *Sec.* 89, 90, 91; *Rex* vs. *Gill*, 2 *B. & A.*, 204; *Per Denman*, *C. J.*, 28; *E. C. L.*, 189; 5 *Barr*, 60; 9 *Cow.*, 609; 1 *Cush.*, 221; 4 *Metc.*, 111, 123; 25 *Vt.*, 415; 31 *Ma.ne*, 386; 1 *Mich. R.*, 216.)

As the indictment charged both an unlawful and criminal object, the means to be used were entirely immaterial. (1 *Greenl. Ev.*, § 91; 9 *Cow. R.*, 612, 615; 1 *Cush.*, 223, 224; 4 *Metc.*, 125; 25 *Vt.*, 415.)

The statements of Bush, sought for on his cross-examination, were privileged. Baldwin was supposed by him to be counsel

at the time. (*Roscoe*, 174; 2 *Stark. Ev.*, 229; 1 *Greenl. Ev.*,
§§ 237, 238, 239, 240, *and cases there cited in notes;* 1 *My.
and K.*, 98.) There need be no suit pending at the time. (1
*Greenl. Ev.*, § 240; *Roscoe*, 178.) If the communication is
made by the client under the belief that he was making it to
his counsel, it is privileged. (2 *Stark. Ev.*, 231; *Smith* vs.
*Fell*, 2 *Curtis*, 661, *cited in* 1 *Greenl. Ev.*, 231, *note*, 2.)
The privilege extends to the client, as well as the attorney.
(4 *Russ. R.*, 190; 1 *My. and K.*, 88; *Ib.*, 98, 101.)

By the Court, COPELAND, J.

Waiving for the present the consideration of the assigned
causes, which relate to the insufficiency of the indictment,
we will proceed to notice those brought up by the bill of
exceptions. Of this class are the seventh and eighth, and
they relate to the exclusion, on the trial below, of the impeach-
ing evidence sought to be obtained from the witness Bush, on
his cross-examination, on the ground that the statements were
privileged, having been made to Mr. Baldwin, an attorney,
under the supposition, as Bush himself testified, that Baldwin
was his counsel. And it was upon the ground of belief, on
the part of Bush, that Baldwin was his counsel, that the Court
refused to have the question answered. Leaving the question
as to whether the relation of attorney and client actually
existed or not, and in regard to which there was a conflict of
testimony between Baldwin and Bush undetermined, we
have no doubt that if a communication should be made to
an attorney in fact, by a party under an impression that such
attorney had consented or agreed to act as the attorney of
such party, that such communication would be privileged,
although the attorney himself may not have so understood the
agreement. But to make the communication a privileged
one, either in that case, or where the relation of attorney and

client exists, it must have been made to the attorney by the party, or client, as his legal adviser, and for the purpose of obtaing his legal advice and opinion, relative to some legal right or obligation.

But there is a broader ground upon which the admission of the excluded evidence may be based ; and that is, the witness Bush was an accomplice in the crime for which the defendants, his associates, were on trial. He had been led to give evidence for the People under an express or implied promise of pardon, or that he should not be prosecuted, on condition that he should make a full and fair confession of the truth. It is a rule of law, that no witness shall be required to answer any question that may tend to criminate himself, yet the accomplice, when he enters the witness box with a view of escaping punishment himself, by a betrayal of his co-workers in crime, yields up, and leaves that privilege behind him. He contracts to make a full statement ; to keep back nothing ; although in doing so he may but confirm his own guilt and infamy. If he fails to do so in full, if he knowlngly keeps back any portion of the history of the crime he undertakes to narrate, he forfeits his right to pardon, and may be proceeded against and convicted upon his own confession, already made. (*Rex* vs. *Rudd*, *Cowper*, 331; *Com.* vs. *Knapp*, 10 *Pick.*, 477; 2 *Russell on Cr.*, 958, *note a.*) We think an accomplice who makes himself a witness for the People, should be required to give a full and complete statement of all that he and his associates may have done or said, relative to the crime charged, no matter when or where done, or to whom said. He should be allowed no privileged communications. These he has voluntarily surrendered. The enforcement of such a rule may be the only protection the party on trial has left—the only means remaining to him to meet, it may be, the perjury of the criminal upon the witness' stand.

We are of opinion that the rulings of the Court below upon this point were erroneous, and that, for this cause, the verdict must be set aside, and a new trial granted, provided it shall be found that the objections to the sufficiency of the indictment are not well founded ; and to the consideration of which we will now proceed.

An indictment has been defined to be a plain, brief, and certain narrative of an offence. (2 *Hale P. C.*, 167.) And, it is a general rule of criminal law, that every indictment must contain a certain description of the crime of which the defendant is accused, and a statement of the necessary facts by which it is constituted. (1 *Chit. Cr. Law*, 169.) This is essential, and is required for the safety and protection of the defendant, and for the information and correct action of the Court, who are to apply the judgment, and administer the punishment prescribed by law. This rule, however, has not, in all cases, been applied to the offence of conspiring, with as much strictness as to other offences. It was remarked by the late Justice Talfourd, that "the offence of conspiring is more difficult to be ascertained precisely, than any other for which an indictment lies." Notwithstanding, however, the apparent diversity of judicial opinion exhibited in the earlier authorities, in respect to this subject, there is a very general concurrence of authority, as to the general definition of the offence: that, to constitute an indictable conspiracy, there must be a combination of two or more persons, by some concerted action to accomplish some criminal or unlawful purpose ; or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means. (3 *Greenl. Ev.*, § 89; 3 *Chit. Cr. Pl.*, 616.)

The expressed doubts upon the subject seem to have arisen from the difficulty in determining what acts should be regarded as unlawful, in the sense in which that term is used, as describing the offence of conspiracy. As Mr. Chitty remarks,

"there are perhaps few things left so doubtful in the criminal law, as the point at which a combination of several persons in a common object becomes illegal." It might, he says, "be inferred from the decisions, that, to constitute a conspiracy, it is not necessary that the act intended should in itself be illegal, or even immoral ; that it should affect the public at large, or that it should be accomplished by false pretences ; and, though it is agreed that the gist of the offence is the union of persons, it is impossible to conceive a combination, as such, to be illegal." "We can rest therefore," he says, "only on the individual cases decided, which depend in general upon particular circumstances, and which are not to be extended." And, by way of summing up the result of the cases, citing from Hawkins, Mr. Chitty continues : "In a word, all confederacies wrongfully to prejudice another, are misdemeanors at common law, whether the intention is to injure his person, his property, or his character."

A leading English authority touching the question under consideration, is that of The King *vs.* Gill *et al.* (2 *Barn. & Cress.* 204), where the indictment charged the defendants with having conspired, by divers false pretences and subtle devices, to obtain and procure for themselves, divers large sums of money of persons named, and to cheat and defraud them thereof, etc. Abbot, C. J., in his opinion sustaining the indictment, and in answer to the objection that the particular devices were not stated, says : "It is possible to conceive that persons might meet together, and might determine and resolve that they would, by some trick and device, cheat and defraud another, without having fixed upon the particular means and devices." While the decision in that case appears to have been adhered to in subsequent cases, it has been regarded as the extreme of laxity. Lord Denman, in Queen *vs.* Parker (3 *Ad. & Ell.*, *N. S.*, 292), says, "this form of indictment is the most general which has been

54

held admissible." And Williams, J., in the same case, said: "It has always been thought that in Rex *vs.* Gill, the extreme of laxity was allowed."

In King *vs.* Seward (1 *Ad. & Ell.*, 706), it was held, " that an indictment for conspiracy ought to show, either that it was for an unlawful purpose, or to effect a lawful purpose by unlawful means. Then, when it is held that such a proceeding is a conspiracy, because it is to be carried into effect by unlawful means, we must see in the means stated something which amounts to an *offence*."

The case of The King *vs.* Eccles, (3 *Doug.*, 337), has been frequently cited in support of a general charge of conspiracy, without any allegation of illegal means. So also of the early case of King *vs.* Sprogg (2 *Burr.*, 993). Lord Ellenborough, subsequently commenting upon those cases, says that the case of King *vs.* Sprogg was a conspiracy to indict another of a capital crime, which no doubt is an offence; that King *vs* Eccles was considered a conspiracy in restraint of trade, and therefore an indictable offence. " But I should be sorry," he says, " that the cases in conspiracy, which have gone far enough, should be pushed still further. I should be sorry to have it doubted whether persons agreeing to commit a *civil trespass*, should be in peril of an indictment which would subject them to infamous punishment." (*King* vs. *Turner*, 13 *East.*, 228.)

In this last case cited, the indictment charged the defendants with conspiracy to snare, take, kill, and carry away hares from a certain preserve, and to procure divers bludgeons and other offensive weapons, and to go to the said preserve armed therewith for the purpose of opposing any person who should endeavor to apprehend them, or obstruct them in the execution of their wicked and unlawful purposes. Thus presenting a very strong case, and, as has been said, having the double aggravation of being done in the night when

honest men are asleep, and with weapons avowedly prepared to break the peace, in case they were attacked within the preserve. It may also be noted, that the destruction of game in England, by unqualified persons, subjects them to a penalty on conviction before a magistrate.

So again, in King *vs.* Jones (4 *Barn. & Ad.*, 345), the indictment stated, that a commission of bankruptcy had issued against A, by virtue of which the Commissioners adjudged him a bankrupt, thereby giving them authority to proceed with the body of said A, and also all his lands, which he had in his own right before he became a bankrupt, etc. It then charged that all the defendants contriving and intending to cheat the creditors of A, unlawfully did conspire to conceal, embezzle, etc. It was held by all the Judges to be bad. They say : "The indictment ought to charge a conspiracy, either to do an unlawful act, or a lawful act by unlawful means ; that the indictment charges a conspiracy to remove and conceal the goods of A, but, if the commission was bad, A had a right to remove them. There is nothing stated, says Denman, C. J., on the face of the indictment to constitute an *offence.* Taunton, J., says : "the indictment ought to contain averments of all matters necessary to constitute an *offence ;* it is not enough to allege matters, which make it probable that an offence has been committed."

And in the case of King *vs.* Regina, in the Exchequer Chamber (2 *Ad. & Ellis, N. S.,* 796), Tindall, C. J., says : "If we examine the allegations in this indictment, there is no sufficient description of any act done after the conspiracy, which amounts to a misdmeanor at common law. None of the overt acts are shown by proper averments to be indictable."

The cases cited, and other modern English authorities, indicate a strong disposition to hold to a much greater

strictness in indictments for conspiracy, than was formerly supposed to be necessary. And the doubt and uncertainty in which the earlier cases, and the elementary writers professedly, leave the question as to where a combination of several persons, in a common object, becomes illegal, has been in a great degree removed. And while the doctrine of the case of King *vs.* Gill, has been steadily adhered to, that in an indictment for a conspiracy to obtain, falsely and fraudulently, by false pretences and subtle devices, the property of another, the pretences and devices need not be alleged, there have not been wanting, says Lord Denman, "occasions where learned Judges have expressed regret, that a charge so little calculated to inform a defendant of the facts intended to be proved upon him, should be considered by the law as well laid. All who have watched the proceedings in our Courts, are aware that there is danger of injustice from calling for a defence against so vague an accusation ; and Judges of high authority have been desirous of restraining its generality within reasonable bounds. The ancient form, however, has kept its place ; and the expedient now employed in practice, of furnishing defendants with a particular of the acts charged upon them, is probably effectual for preventing surprise and unfair advantages." (*Rex* vs. *Kenrick*, *Supra ;* *Rex* vs. *Hamilton*, 7 *Car. & P.*, 448.)

It has been said, as we have already seen, and there is to be found in both the English and American authorities of an early date, *dicta*, that a combination for the commission of acts, illegal in a moral sense, or for the commission of acts not in themselves morally wrong or unlawful, by means morally wrong, constitutes an indictable offence. But I apprehend that the more recent adjudicated cases do not support that proposition.

In the case of the State *vs.* Hewett (31 *Maine*, 396), the indictment charged that the defendants "devising and

intending to injure and defraud, did unlawfully conspire, combine, confederate, and agree together, the said O. L. to injure, cheat and defraud of a certain horse, the property of said O. L., etc." The Court in that case say, that " to constitute an indictable conspiracy at common law, there must have been an unlawful confederacy of two or more persons, to accomplish either an unlawful or criminal purpose, or a purpose not unlawful, by criminal or unlawful means. This indictment assumes to charge a conspiracy to accomplish an unlawful purpose, and falls within the first class of conspiracies mentioned, if it falls within either class. The purpose only is stated ; the inquiry then is, whether the purpose, as charged in the indictment, was criminal, or unlawful at common law or by statute. Cheating and defrauding a person of property, though never right, was not, necessarily, an offence at common law. The transaction might be dishonest and immoral, and still not be unlawful, in the sense in which the term is used in criminal law." The indictment was held to be bad, not charging an offence at common law.

In a prior case (*State* vs. *Ripley*, 31 *Maine*, 386), the same Court, says : " If the conspiracy is to do an act, which, if done, would be criminal, the offence is perfect, without reference to the means used ; and it is necessary that this criminal purpose should be so specifically alleged, as to be well understood. If the conspiracy consists in the unlawful means to be employed, according to the well established rules of pleading, those means, which are relied upon as giving the wrongful agreement a criminal character, should be specifically stated." (*See also State* vs. *Rogers*, 34 *Maine*, 320.) Such is also now the established doctrine in Massachusetts. (*Commonwealth* vs. *Hunt et al.*, 4 *Metc. R.*, 111; *Commonwealth* vs. *Eastman et al.*, 1 *Cush.*, 190; *Commonwealth* vs. *Shedd et al.*, 7 *Cush.*, 514.) In the latter case, the Court remark : " It is well settled, that a general allegation, that

Major and William Alderman, plaintiffs in error, *vs.* The People, defendants in error.

two or more persons conspired to effect an object criminal in itself, as to commit a midemeanor or a felony, is quite sufficient, although the indictment omits all charges of the particular means to be used. It is equally well settled, that a general charge of a conspiracy to effect an object not criminal, is not sufficient. The charge of such a conspiracy is to be accompanied with the further statement of the means the conspirators concerted and agreed to use to effect the object; and those means must appear to be criminal." So also in Pensylvania. (*Hartmann et al* vs. *Commonwealth*, 5 *Barr.*, 60.) The indictment charged that the defendants conspired falsely and fraudulently to cheat and defraud persons named, by removing and secreting divers goods and merchandise, belonging to the defendants, thereby preventing said goods from being made liable for the debts of defendants, etc. Gibson, C. J.: "The conspiracy as charged, is not to do an act illegal in itself, or by combination of numbers and means in the execution of it, but to do an act thought to be specifically prohibited by statute. It is certainly not criminal by the common law, to obtain a false credit by any other means than the use of a false token, or to secrete a debtor's property with the design to keep it from his creditors. But such acts are penal by the statute to abolish imprisonment for debt. Now, to constitute a conspiracy, the purpose to be effected by it must be unlawful, either in respect to its nature, or in respect to the means to be employed for its accomplishment; and the intended act, where it has not a common law name to import its nature, must, in order to show its illegality, be set forth in an indictment for conspiracy with as much certainty as would be necessary in an indictment for the perpetration of it; otherwise it would not be shown to be criminal, nor would the confederates be shown to be guilty." The English Courts, he says, "are beginning to regret the laxity of description that has been tolerated in these indictments for

conspiracy; and policy requires that the Judges here, as well as there, should begin to retrace their steps."

Again, in New Jersey (*State* vs. *Rickey*, 4 *Halstead*, 293), Ford, J., in an elaborate opinion, in which he reviews the earlier authorities, says : "It may be laid down as a settled rule, that an indictment will not lie for conspiracy to commit a civil injury of any description, that is not, in itself, an offence."

A leading American authority upon this subject, is that of Lambert *vs.* The People of New York (9 *Cow.*, 578). In that case the questions we are considering were involved, and the indictment was held to be bad in the Court of Errors, by the casting vote of the President. Two distinguished Senators, members of that Court, Spencer and Stebbins, having taken opposite sides of the question, the preceding authorities were reviewed, and the whole subject elaborately discussed. Chancellor Jones concurred with Senator Spencer, in holding the indictment insufficient.' The *object* stated in that indictment, was very like the object stated in the indictment we are considering : "by wrongful and indirect means to *cheat and defraud* the Company and unknown persons."

As an evidence of the marked change, or, more properly perhaps, of the greater clearness and certainty exhibited in the later authorities upon this subject, we find Senator Stebbins, in a partial summing up upon the point in question, making this remark : "We have the opinions of the Courts of Maryland, Pennsylvania and Massachusetts, the opinions of the elementary writers, all going to show, in my estimation, that such a conspiracy as that charged is an indictable offence." Still, in view of the uncertainty and doubt, in his own mind, in which the question was left by preceding authorities, he further observes, "It would probably be too much to say, that every conspiracy to defraud an individual,

or to do an unlawful act, is indictable." It should be observed that the decision in that case was made in 1827, long prior to the making of the decisions in Massachusetts and Pennsylvania, which, as we have seen, now establish a doctrine directly the opposite of that contended for by Senator Stebbins. The only case in our own Court, where questions similar to those now under consideration were raised, is that of the People *vs.* Richards *et al.* (1 *Mann.*, 216).

The adoption, in that case, of the views of the Supreme Court, and of the minority of the Court of Errors, as expressed by Senator Stebbins in the preceding case, and some remarks of the learned Judge who delivered the opinion in that case, may undoubtedly be regarded as sustaining the views of the counsel for the People, in the case before us. But in that case, the Court probably did not give the principal question here raised any considerable consideration, for the reason that it was not necessary to do so, in determining the valdity of the then pending indictment, wherein the alleged means of executing the conspiracy were criminal in their character. Finally, from the whole current of present authorities, I think the following principles are clearly deducible:

1. That, to constitute an indictable conspiracy, there must be a combination of two or more persons to commit some act, known as an offence at common law, or that has been declared such by statute.

2. If the conspiracy be to commit an offence, known and recognized as an offence at common law, so that, by describing it by the term by which it is generally known, the nature of the offence is clearly indicated, then it will only be necessary to use such term in describing the object of the conspiracy.

3. If, on the contrary, the combination be to do an act, not in itself unlawful, but which it is agreed to accomplish by criminal or unlawful means, then those means must be

Major and William Alderman, plaintiffs in error, *vs.* The People, defendants in error.

particularly set forth, and be such as constitute an offence, either at common law or by statute.

The gist of the offence in conspiracy, is the unlawful combination and agreement. It is not necessary, to constitute the offence, that any overt acts should be done in pursuance of such combination and agreement, nor that such overt acts should be alleged.

The combination and agreement, the intent to commit the illegal act, constitutes the offence, and in this respect it diverges from the general rule of criminal law. But there seems no good reason for going further, and judicially determining, in cases as they arise, acts to be an offence which are not such at common law, nor have been declared such by any statute, and for departing entirely from the general rule of pleading in criminal cases, that such facts must be stated upon the record as, in the judgment of law, are sufficient to constitute an offence.

We will now proceed to examine the indictment in this case, in the light of the principles stated.

The first count charges, that the defendants " did conspire, combine, confederate and agree, falsely and fraudulently, to cheat and defraud said persons and mercantile houses, and others doing business as aforesaid, etc., of divers large quantities of goods, and the prices and value thereof." This charge is more general than that which has, in any case which has come under our notice, received the sanction of the English Courts ; more general than that in the King *vs.* Gill, which has always been regarded as the extreme of laxity, as we have seen in Queen *vs.* Parker. The only words in the object stated, indicating an offence, are the words *cheat and defraud.* But those words, say the Courts in Com. *vs.* Eastman, Com. *vs.* Shedd, and State *vs.* Hewett, " do not import any known common law offence. If punishable at at all as a crime, it is only when the cheat is effected by false

55

tokens or false pretences. To make such an object of conspiracy a criminal act, the combination 'or agreement must be, to cheat and defraud in some of the modes made criminal by statute, and the indictment must contain allegations which show, that the cheat and fraud agreed upon are embraced in such statute provisions, and that if perpetrated, would be punishable as a criminal offence."

But it is claimed, that the object of the conspiracy was agreed to be accomplished by criminal means. What, then, are the means by which the alleged object of the conspiracy was to be accomplished? Bush and his wife were to convey to Alderman one hundred and thirty acres of land, together with forty acres then held in Alderman's name. As a consideration for such conveyance, Alderman was to give up to Bush notes and securities he then held against him, amounting to $800 ; was to sign a note to one Bassey for $180, as security for Bush, and advance him money to keep up his credit, as alleged, to the amount of $250, being something more than the land, as alleged in the indictment, was worth, subject to certain liens. That Bush should go to Detroit, and on his sole credit and account, purchase goods, take them to White Lake, and there expose them to sale ; that subsequently, Bush should sell the remainder of the goods so purchased, with any others he might have on hand, to Alderman, who was to convey to Bush the one hundred and seventy acres of land, and take back a mortgage.

None of these alleged means are in themselves immoral, even. There is no allegation whatever, that in obtaining the goods, any false pretence, false token, or other device, was to be used. Nothing, certainly, tending to support the alleged object of the conspiracy: to cheat and defraud.

It is said the alleged means are criminal, in that they come within the provisions of Section 17, of Chapter 142, Revised Statutes, which makes it a misdemeanor for any person to

secrete, assign, convey, or otherwise dispose of any of his property, with intent to defraud any creditor, or to prevent such property from being made liable for the payment of his debts, or for any person to receive such property with such intent. Admitting that to be so, it affords no support to this indictment; for none of the offences named in said section are alleged as the object of this conspiracy. There are no allegations in either part of either count, which show that the cheat and fraud agreed upon are embraced in any statute provision.

The judgment must be reversed.

Present, COPELAND, DOUGLASS, GREEN, PRATT, MARTIN, J. J.

JOHNSON, J., decided the cause in the Court below, and did not participate.

DOUGLASS, J., I concur in the opinion that the indictment is insufficient, and that the judgment below should be reversed on that ground; but, it being unnecessary for the determination of the case, I decline expressing an opinion upon any of the other questions presented by the bill of exceptions.