PEOPLE v RICKY SMITH

Docket No. 30524. Submitted October 6, 1977, at Grand Rapids.—
Decided August 7, 1978.

Defendant Ricky D. Smith was convicted, on his plea of guilty, of
armed robbery, Grand Traverse Circuit Court, William R.
Brown, J.

Prior to the defendant's arrest, the police departments in
Flint and Traverse City were investigating numerous armed
robberies in those two cities. Suspicion centered on the defend-
ant and one Jack Lown, an escapee from the Michigan prison
system. At that time, in early 1976, defendant and Lown were
staying with Lown's sister at her residence in Flint, and the
Flint police on March 31, 1976, had the house under surveil-
lance. The Traverse City police sent copies of latent finger-
prints taken from the premises of one of the robberies in
question to a fingerprint evidence expert for comparison with
the known fingerprints of the defendant and Lown. The expert
reported that the latent prints matched those of both suspects.
On the basis of this and other information, the Traverse City
police obtained an arrest warrant for Lown and the defendant.

On March 31, 1976, the Traverse City police informed the
Flint police that they were on their way to Flint with the

REFERENCES FOR POINTS IN HEADNOTES

[1, 7] 21 Am Jur 2d, Criminal Law § 493.
[2] 5 Am Jur 2d, Arrest §§ 7, 43, 44, 46.
    68 Am Jur 2d, Searches and Seizures §§ 23, 88.
    What constitutes probable cause for arrest—Supreme Court cases.
    28 L Ed 2d 978.
    Search and seizure: Observation of objects in "plain view"—Su-
    preme Court cases. 28 L Ed 2d 978.
[3] 5 Am Jur 2d, Arrest §§ 76, 77.
    21 Am Jur 2d, Criminal Law § 440.
[4] 5 Am Jur 2d, Appeal and Error §§ 772, 774.
    68 Am Jur 2d, Searches and Seizures §§ 100, 101.
[5] 29 Am Jur 2d, Evidence §§ 571, 572.
    Admissibility of confession as affected by its inducement through
    artifice, deception, trickery, or fraud. 99 ALR2d 772.
[6] 16 Am Jur 2d, Constitutional Law § 113.

arrest warrants. The Flint police who had the house under surveillance saw both men drive away from the house and head for the city limits. The officers followed the suspects and stopped the car as it reached the city limits. Upon approaching the car the officers observed a revolver lying on the floor of the car and what they believed to be a small safe on the back seat, partially covered by a blanket. Both suspects were arrested for armed robberies in both Flint and Traverse City, the items in the car were seized and the suspects taken to the Flint police station.

At the Flint police station the defendant was advised of his *Miranda* rights after which he indicated knowledge of Lown's criminal activity in Traverse City, but made no incriminating statements concerning himself.

A search of the Flint residence was undertaken after the defendant and Vicky Cooper, the defendant's girlfriend and Lown's sister, signed consent forms. In the search some evidence of the Traverse City crimes was turned over to the police by the defendant.

At about 10 p.m. on the night of the defendant's arrest, Detective Bobier of the Traverse City Police arrived in Flint with arrest warrants. The defendant was again advised of his rights and made several confessions to Detective Bobier as to his involvement in the Traverse City cases. On the following day, April 1, Detective Bobier obtained a signed confession as to one of the Traverse City offenses.

The defendant was not transferred to Traverse City until April 3. The delay was allegedly for the purpose of allowing the Flint authorities to decide whether they would press any charges against the defendant for the offenses occurring in Flint.

On April 4, Detective Bobier obtained a number of typed confessions concerning the Traverse City offenses. The defendant was arraigned on April 5, on four counts of armed robbery.

Subsequent to his arraignment, the defendant moved to suppress his confessions and the evidence obtained in the search of the Flint residence. The trial court, on June 14, ruled that the confessions were admissible and that the consent search was valid.

On June 15, 1976, the defendant pled guilty in Traverse City to one count of armed robbery. As consideration for the plea, the prosecution agreed to dismiss and/or stop prosecution on the three other Traverse City charges.

Some time after June 16, 1976, it became known that the

fingerprint expert involved in the case had been falsifying evidence in recent cases and that he had lied about the matching of the defendant's prints to those found at the scene of the Traverse City robbery.

The defendant then filed a second motion to suppress his confessions and a motion to withdraw his plea and the court again ruled that the confessions were admissible but granted the motion to withdraw the plea.

On August 6, 1976, the defendant again pled guilty to one count of armed robbery and again the prosecution agreed not to pursue the other charges, and in addition, agreed that the defendant could raise on appeal the denial of his motion to suppress his confessions and the evidence obtained in the search. The defendant appeals. *Held:*

1. Qualified pleas are enforceable and the defendant, therefore, may appeal the denial of his motion to suppress his confession. The arrest of the defendant was valid, despite the use of the false fingerprint information in obtaining the arrest warrant, because the arresting officers had adequate cause to stop the car containing the suspects and after the legal stop the plain view discovery of the gun and safe together with other information known by the police authorized the arrest of the suspects.

2. The trial court's decision that the consent search was valid was not clearly erroneous.

3. The falsified fingerprint evidence did not coerce the defendant's confession because the fingerprint information was mentioned only after the defendant had already confessed.

Affirmed.

BRONSON, J., would hold that qualified pleas are not authorized in Michigan and are not enforceable. However, he would not apply the rule to this defendant since in the interest of judicial economy the case at bar should be reviewed on its merits.

OPINION OF BRONSON, J.

1. CRIMINAL LAW—PLEAS OF GUILTY—QUALIFIED PLEAS.
    *Qualified guilty pleas should not be enforced in the absence of court rules or statutes authorizing such pleas.*

2. ARREST—VALIDITY OF ARREST—ARREST WARRANT—ARREST WITHOUT WARRANT—PLAIN VIEW.
    The arrest of a defendant on an armed robbery charge was valid, regardless of the validity of a warrant for the defendant's

arrest, where the arresting officers had adequate cause to stop the car in which the defendant and another suspect were riding and where, after the legal stop of the vehicle, the plain view discovery of incriminating evidence together with other information known by the police authorized the arrest of the defendant and the other occupant of the car.

3. CRIMINAL LAW—ARREST—ARRAIGNMENT—DELAY—EVIDENCE—CONFESSIONS—UNREASONABLE DELAY—EXCLUSION OF EVIDENCE—STATUTES.

The statutes governing the arrest-arraignment process provide that after a defendant has been arrested on felony charges he shall be taken before a magistrate for arraignment without unnecessary delay; this does not require the exclusion of every admission or confession obtained during a period of unreasonable delay; only when the delay has been employed as a tool to extract a statement has an exclusionary rule been imposed under these statutes (MCL 764.13, 764.26; MSA 28.871[1], 28.885).

4. SEARCHES AND SEIZURES—CONSENT SEARCH—TOTALITY OF CIRCUMSTANCES—APPEAL AND ERROR.

A trial court is to review the totality of circumstances in determining the validity of a consent search; the Court of Appeals will reverse only if the trial court's decision was clearly erroneous.

5. CRIMINAL LAW—CONFESSIONS—VOLUNTARINESS OF CONFESSION—EVIDENCE—FINGERPRINTS—FALSIFIED FINGERPRINT REPORT.

A defendant's confession was not coerced by a falsified fingerprint report where the fingerprint evidence was mentioned only after he had confessed.

OPINION OF M. F. CAVANAGH, P. J.

6. CONSTITUTIONAL LAW—DECISION ON NONCONSTITUTIONAL GROUND—CRIMINAL PROCEDURE—ORDER OF DECIDING ISSUES.

A court should avoid decision of a constitutional issue if a case can be resolved on a nonconstitutional ground; however, this is only a rule for determining which of the issues raised before the court should be decided, it is not a rule to keep cases from coming before the court; this law does not support or imply a rule of criminal procedure which makes it difficult for defendants to present a constitutional issue where that is the sole dispositive issue in the case.

7. Criminal Law—Pleas of Guilty—Qualified Guilty Pleas—En-
      forcing Qualified Pleas.
      A uniform policy should be established either by court rule or by
      a decision of the Michigan Supreme Court on the enforcing of
      qualified pleas of guilty; however, the Court of Appeals, in the
      interim, should not create by judicial opinion a uniform policy
      of not enforcing qualified pleas; qualified pleas should be en-
      forced.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *John D. Foresman,*
Prosecuting Attorney, and *Dennis LaBelle,* Assist-
ant Prosecuting Attorney, for the people.

*David S. Brady,* for defendant on appeal.

Before: M. F. Cavanagh, P. J., and Bronson and
M. J. Kelly, JJ.

Bronson, J. Defendant Ricky Dale Smith was
convicted, upon his plea of guilty, of one count of
armed robbery, MCL 750.529; MSA 28.797. He
appeals as of right. A detailed statement of facts is
necessary to our disposition of this case.

In the first months of 1976 the police depart-
ments in Flint and Traverse City began investiga-
tions of numerous armed robberies in those two
cities. Suspicion centered on two people, one Jack
Lown, an escapee from Michigan's prison system,
and defendant. Both police departments discovered
that Lown and defendant were staying at the Flint
residence of Lown's sister.

On March 31, 1976, Flint police had the house
in question under constant surveillance. The Tra-
verse City police, in order to solidify their investi-
gation, sent copies of latent fingerprints taken
from the premises of one of the robberies in ques-
tion to a Detective Dale Rose, a fingerprint evi-

dence expert, for comparison with the known fingerprints of Lown and defendant. Detective Rose reported that the fingerprints taken from the crime scene matched those of both suspects. On the basis of all of the information obtained by the Traverse City police, including the fingerprint identification, an arrest warrant was obtained for Lown and Smith by the Traverse City police.

On March 31, the Traverse City police informed the Flint police of the existence of the warrants and that they were on their way to Flint to arrest Lown and Smith. While the Traverse City police were en route to Flint, the Flint police on surveillance duty at the house saw two men drive away from the house. The police followed the car and stopped it as it reached the city limits. When the police approached the car they observed a revolver lying on the floor of the car and what they believed to be a small safe on the back seat, partially covered by a blanket. Smith and Lown were arrested for armed robberies in both Flint and Traverse City, the items in the car were seized, and the prisoners taken to the Flint police station.

At the police station, defendant, after being advised of his *Miranda* rights, was questioned by Sergeant Albritton of the Flint police beginning about 7:30 p.m. At this time defendant made no incriminating statements concerning himself, but did indicate knowledge of Lown's criminal activities in Traverse City.

Defendant also indicated that he would consent to a search of the Flint residence and would turn over evidence of some of the crimes. The search was undertaken, with defendant and Vicky Cooper, defendant's girlfriend and Lown's sister, signing consent forms. In the search some evidence of the Traverse City crimes, including a police

radio and part of a coin collection, was turned over to the police by defendant.

At about 10 p.m. on the night of the defendant's arrest Detective Bobier of the Traverse City police arrived in Flint with the arrest warrants. After being advised of his rights defendant was questioned by Detective Bobier and made several confessions as to his involvement in the Traverse City cases. Detective Bobier also talked to defendant on the following day, April 1, and obtained a signed confession as to one of the Traverse City offenses.

Defendant remained in the Flint jail. On April 3, the Traverse City police returned to Flint and transferred defendant to Traverse City. The delay was alleged to have been for the purpose of allowing the Flint authorities to decide whether they would press any charges against defendant for offenses occurring in Flint.

On April 4, Detective Bobier spent several hours with defendant and obtained a number of typed confessions concerning the Traverse City offenses. Detective Bobier admitted that he sought to obtain these statements on April 4 because he knew that his chances of getting them after defendant was arraigned and provided with an attorney were minimal. Defendant was arraigned the next day, April 5, on four counts of armed robbery.

Subsequent to his arraignment defendant moved to suppress his confessions and the evidence obtained in the search. The court heard both motions on June 14, 1976. The court ruled that the confessions were admissible and that the consent search was valid.

On June 15, 1976, defendant pled guilty in Traverse City to one count of armed robbery, in connection with the robbery of the Tanz Haus restaurant on March 13, 1976. As consideration for

his plea the prosecution agreed to dismiss and/or stop prosecution on the three other Traverse City charges.

Sometime after June 16, 1976, the Traverse City police became aware that Detective Rose, the fingerprint expert involved in the present case, had been intentionally falsifying evidence in recent cases. The fingerprint evidence concerning defendant was rechecked with the Michigan State Police, resulting in a finding that Detective Rose had lied about the matching of defendant's prints to those found at the scene of the Traverse City robbery.

After being made aware of this information, defendant filed a second motion to suppress his confessions and a motion to withdraw his plea. The court heard these motions on August 4, 1976. The court held that the confessions were still admissible, but granted the motion to withdraw the plea.

On August 6, 1976, defendant again pled guilty in connection with the Tanz Haus robbery. As consideration for this plea the prosecution again agreed not to pursue the other charges, and in addition agreed that defendant could raise on appeal the denials of his motions to suppress his confessions and the evidence obtained in the search.

I.

The first issue which confronts us is one of first impression in Michigan—whether a plea agreement by which a defendant reserves the right to appeal nonjurisdictional issues is valid and enforceable.[1] Cases from other jurisdictions are split on this issue.

_____

[1] The issue was raised but not decided in *People v Alvin Johnson,* 396 Mich 424, 440, n 15; 240 NW2d 729 (1976). In a footnote, Justice WILLIAMS' opinion for the Court noted that Federal courts were split

In *United States v Cox*, 464 F2d 937 (CA 6, 1972), the Sixth Circuit Court of Appeals held that qualified pleas[2] were not valid and enforceable, even though consented to by the prosecutor and the trial court. The Court stated:

"The procedure employed in the case at bar is at variance with the general, well-settled rule that a guilty plea 'normally rests on the defendant's own admission in open court that he has committed the acts with which he is charged'. * * * When made by the accused, knowingly, willingly and with the benefit of competent counsel, a plea of guilty waives all non-jurisdictional defects." (Citations omitted.) 464 F2d at 940.

After discussing the exception to the plea-waiver rule where the defendant raises a constitutional challenge to the statute underlying the conviction, as outlined in *Haynes v United States*, 390 US 85; 88 S Ct 722; 19 L Ed 2d 923 (1968), the *Cox* Court held:

"It would appear, therefore, that the *Haynes* rule is of limited applicability and is constricted to a narrow class of constitutional questions. It is applicable only where the jurisdiction of the trial court to proceed on the criminal charges is directly placed in question. The *Haynes* rule does not apply in cases where a guilty plea has been entered despite the presence of non-jurisdictional constitutional questions, usually arising out of the Fourth and Fifth amendments.

"This is not to say that there is not substantial support for extending the *Haynes* rule to most guilty plea situations. However, despite the existence of that

over the validity of a qualified plea which allows a defendant to raise nonjurisdictional issues on appeal, citing *United States v Cox*, 464 F2d 937 (CA 6, 1972), and *United States v Caraway*, 474 F2d 25 (CA 5, 1973), opinion vacated as moot, 483 F2d 215 (CA 5, 1973).

2 We use this term to refer to guilty pleas made pursuant to a plea agreement that nonjurisdictional issues may be raised by defendant on appeal.

respectable authority, we decline to adopt as a rule in the Sixth Circuit the procedure allowed by the district court in the instant case.

"To the extent this procedure allows a defendant to plead guilty, contingent on his right to appeal on nonjurisdictional grounds from his own plea, it is not logically consistent and is against the trend of recent case authority. There is a fundamental and basic inconsistency between knowingly and intelligently entering a voluntary plea of guilty, and then appealing from the judgment entered on the basis of that plea." (Footnote omitted.) 464 F2d at 941–942.

The *Cox* Court went on to discuss the dilemma faced by a criminal defendant who, having lost on a motion to suppress evidence that will in all probability lead to his conviction, has to decide whether to go to trial or accept a plea bargain. The Court reasoned, quite correctly, that in light of the plea waiver doctrine one of the critical factors in this decision is the likelihood that following the trial the decision on the motion to suppress will be overturned on appeal. The defendant, and his counsel, must weigh the chances of a reversal on appeal with the benefit to be gained from a possible charge or sentence plea bargain.

Contrasting this common situation to the case at bar, the Court stated:

"However, the district court allowed defendants the best of two worlds. They were allowed to plead guilty to reduced charges, while reserving their right to appeal as if they had maintained their innocence through trial. They therefore obtained from a no doubt harried prosecutor, in consideration of their plea, an advantage they may not have received had they gone to trial on their pleas of guilty to charges of armed robbery. Under *Santobello* [404 US 257; 92 S Ct 495; 30 L Ed 2d 427 (1971)], * * * the defendants have the right to hold the prosecutor to his side of the bargain. It strains logical

consistency and legal definition to allow appeal from such situations. The defendants clearly want to have their cake while preserving their rights to eat it at some future date." 464 F2d at 944.

The *Cox* Court also argued that review of often complex constitutional and evidentiary issues following a guilty plea may often be difficult given the sometimes limited record provided by a plea. The Court reasoned that without a full record, as is provided where there has been an adversarial trial, it is more difficult not only to review the claim of error but also, if error is shown, to review the effect of the error on the remainder of the case. 494 F2d at 944–945.

The rationale of this argument is that all of the evidence available and admissible against the defendant may not be evident from the record of a motion to suppress only a part of that evidence. In that situation it is possible either that the challenged evidence would never have been used at a trial or that the use of the invalid evidence would have been harmless in the context of a full trial. A decision on either of these two possibilities is very difficult where a plea has been entered, foreclosing knowledge of what would have occurred at the trial.

In the situation where all of the evidence is subject to a motion to suppress, the *Cox* Court still found no reason to allow an appeal of the denial of suppression following a plea:

"Even in such a situation, we can see no reason to allow the defendant to plead guilty following an unfavorable ruling on a motion to suppress and reserve his right to appeal. A trial of such limited evidence would be short and relatively easy to try. We can think of no compelling policy ground for altering generally accepted notions of the meaning and significance of guilty

pleas for this rather limited category of cases." 464 F2d at 945.

In conclusion, the *Cox* Court outlined the balancing decision it had made before deciding to disallow the use of qualified pleas:

"In sum, while we can see that the proposed procedure may ease the docket pressures confronting many district courts, we believe the disadvantages in terms of the internal consistency of our criminal process, the accuracy of appellate review, and conflict with the hoary doctrine of avoiding constitutional questions if possible, far outweight the putative gains. Therefore the procedure of allowing appeal on non-jurisdictional grounds following intelligent and voluntary pleas of guilty will not be countenanced in the future in this Circuit." 464 F2d at 945.

Similarly, the Fifth Circuit, *en banc,* strongly disapproved the procedure of allowing a defendant to plead guilty and retain the right to raise nonjurisdictional issues on appeal in *United States v Sepe,* 486 F2d 1044 (CA 5, 1973).[3] See, also, *United States v Mizell,* 488 F2d 97 (CA 5, 1973), developing precedent and some of the reasons supporting *Sepe.*

In *State v Turcotte,* 164 Mont 426; 524 P2d 787 (1974), the Montana Supreme Court refused to enforce qualified pleas absent an authorizing statute. See, also, *People v Green,* 21 Ill App 3d 1072; 316 NE2d 530 (1974).

There is authority, however, indicating that qualified pleas are valid and enforceable. See, *e.g., United States v Doyle,* 348 F2d 715 (CA 2, 1965) (dictum), *Cooksey v State,* 524 P2d 1251 (Alas,

---

[3] Prior to the *en banc* decision in *Sepe,* a panel had enforced a qualified plea in *United States v Caraway,* 474 F2d 25 (CA 5, 1973), *vacated as moot,* 483 F2d 215 (CA 5, 1973).

1974), *Jackson v State,* 294 So 2d 114 (Fla App, 1974), *State v Crosby,* 338 So 2d 584 (La, 1976). Three state legislatures have enacted statutes authorizing this procedure. See California Penal Code, § 1538.5(m); NY Crim Pro Code § 710.70(2); Wisc Stat Ann § 971.31(10). Also, some commentators have endorsed the adoption of rules or statutes authorizing qualified pleas. See, *e.g.,* ABA Project on Standards for Criminal Justice, Standards Relating to Criminal Appeals, § 1.3(a)(iii), Comment (c), (Approved Draft 1970); Comment, *Appellate Review of Constitutional Infirmities Notwithstanding a Plea of Guilty,* 9 Houston L Rev 305 (1971).

The basic reason cited in favor of enforcing qualified pleas is that otherwise a defendant is forced to go through a costly and futile trial in order to preserve for appeal an issue based on the denial of a pretrial motion to suppress evidence.

We believe there are meritorious arguments on both sides of this issue. However, we are persuaded by the reasons cited in *Cox* that it is contrary to sound policy to allow the litigants to force the courts to consider constitutional issues and to foreclose courts from finding that in a given case any erroneous denial of a suppression motion is harmless error. The benefit gained by preventing trials necessitated solely by a desire to preserve nonjurisdictional issues is outweighed by these adverse effects on the administration of justice.

Even if we were to find the reasons for enforcing qualified pleas more compelling than those for not enforcing such pleas, we would hesitate to enforce qualified pleas absent an authorizing court rule or statute. The commentators cited above who support the enforcement of qualified pleas recommend

that authorization be by court rule or statute. Three of the states allowing qualified pleas have done so by legislation. Also, other state courts have declined to enforce these pleas absent a rule or statute. See *State v Turcotte, supra, People v Green, supra.*

Dealing with qualified pleas by rule or statute rather than judicially is desirable from the standpoint of uniformity. Plea-taking procedures are already regulated in great detail by court rule. See GCR 1963, 785.7. Any addition to established procedures should also be so regulated. Finally, until there is a definitive rule or statute, trial courts must guess whether a conditional plea will be enforced in that particular case before deciding whether to accept the plea.[4]

Therefore, we will decline to enforce qualified pleas in the future. However, in the interest of judicial economy, we will decide the case at bar on the merits. See *United States v Cox, supra.*

## II.

Defendant first contends that the use of false fingerprint evidence invalidates the arrest warrant in the case at bar, rendering the stop and arrest of defendant illegal.

We hold that the arrest of defendant was valid. Police had adequate cause to stop the car containing Lown and defendant under *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). See *People v Whalen,* 390 Mich 672; 213 NW2d 116 (1973). After a legal stop, the plain view discovery of the safe and gun in the car, together with other information known by police, authorized the arrest

---

[4] If the plea bargain cannot be enforced, defendant must be allowed to withdraw his plea. *Santobello v New York,* 404 US 257; 92 S Ct 495; 30 L Ed 2d 427 (1971).

of Lown and defendant. Therefore, the arrest was valid regardless of the validity of the arrest warrant.

### III.

The second issue raised by defendant concerns the effect of delay between arrest and arraignment on a confession obtained during the delay. The applicable law was recently summarized in *People v White,* 392 Mich 404, 424; 221 NW2d 357 (1974):

"The statutes governing the arrest-arraignment process provide that after a defendant has been arrested on felony charges he shall be taken before a magistrate for arraignment 'without unnecessary delay.' MCLA 764.13, 764.26; MSA 28.871(1), 28.885. These sections, while straightforward in their command to the police, have not been interpreted by this Court or require the exclusion of every admission or confession obtained during a period of unreasonable delay. Only when the delay has been employed as a tool to extract a statement has an exclusionary rule been imposed under these sections. *People v Hamilton,* 359 Mich 410; 102 NW2d 738 (1960); *People v Harper,* 365 Mich 494; 113 NW2d 808 (1962); *People v Farmer,* 380 Mich 198; 156 NW2d 504 (1968)."

In the case at bar, defendant confessed, on the night of his arrest, to his involvement in several Traverse City robberies including the one robbery to which he pled guilty. Over the next four days, during which defendant was detained in Flint and Traverse City, police obtained written confessions to those robberies.

The prosecutor asserts that the five-day delay in arraignment was reasonable, as Flint police needed time to investigate numerous potential charges and decide whether to charge defendant.

We need not discuss this issue, however, as we hold that even if the delay was unreasonable, it was not used by police to extract a statement. See *People v White, supra.* Defendant had confessed on the night of his arrest after freely waiving his *Miranda* rights. He has failed to show that the delay in arraignment was used to coerce subsequent written statements covering the same subject matter as his original confession.

## IV.

Defendant's third contention is that his consent to search his house was invalid, requiring suppression of the evidence seized in that search.

The trial court is to review the "totality of circumstances" in determining the validity of a consent search. *People v Chism,* 390 Mich 104; 211 NW2d 193 (1973). On appeal, we will reverse only if the trial court's decision was clearly erroneous. *Id.* On reviewing the record, we do not find that the trial court's decision was clearly erroneous.

## V.

Finally, defendant contends that his confession must be suppressed because it was coerced by tainted evidence—the falsified fingerprint report from Detective Rose.[5] The trial court found that the fingerprint evidence was mentioned to defendant only after he had confessed. If so, the confession could not have been coerced by the tainted evidence. Even assuming that Detective Bobier mentioned fingerprint evidence to defendant before he confessed, we do not find after a review of the "totality of circumstances", that the confession

---

[5] Detective Bobier did not know at that time that the fingerprint report was false.

was thereby rendered involuntary and inadmissible. See *Frazier v Cupp,* 394 US 731; 89 S Ct 1420; 22 L Ed 2d 684 (1969), Anno: *Admissibility of confession as affected by its inducement through artifice, deception, trickery, or fraud,* 99 ALR2d 772, 791–796.

Affirmed.

M. F. Cavanagh, P. J. *(concurring in part; dissenting in part).* With the exception of his remarks concerning qualified (or conditional) pleas, I concur in my Brother Bronson's opinion. I write separately only because I am unpersuaded by the arguments made in behalf of a refusal to enforce such pleas.

Among those arguments is the contention that conditional pleas are contrary to sound policy because they force the courts to consider constitutional issues. It is fundamental law that a court will avoid decision of a constitutional issue if a case can be resolved on a nonconstitutional ground. *Neese v Southern R Co,* 350 US 77; 76 S Ct 131; 100 L Ed 60 (1955). However, this is only a rule for determining which of the issues raised by a case before the court should be decided. It is not a rule to keep cases from coming before the court. This law does not support or imply a rule of criminal procedure which makes it difficult for defendants to present a constitutional issue where that is the sole dispositive issue in the case.

Moreover, the trial court will have been "forced" to decide the question anyway. A qualified plea simply expedites the appeal of this decision by saving a possibly needless, expensive and time-consuming trial.

A second argument made against qualified pleas is that they prevent this Court from finding harm-

less error in the denial of a motion to suppress. This argument merits careful analysis.

When this Court makes a finding of harmless error in the admission of evidence at trial it second-guesses the trier of fact to determine how the trier would have decided the case without the admission of the challenged evidence. In a qualified plea situation, if the lower court's ruling on the suppression motion is found to be error and the case remanded for further proceedings, it will ultimately be the trier of fact itself who determines whether the prosecution's case, without the suppressed evidence, proves defendant's guilt beyond a reasonable doubt. I find it preferable that this decision be made by the trier of fact, who sees the witnesses first-hand, rather than by an appellate court, which sees only the record and exhibits. I also think it more consistent with the right to trial by jury that the factfinder make the ultimate finding on the weight of the properly admitted evidence. I therefore see no disadvantage in eliminating the appellate court's power to find harmless error here.

A third objection raised to conditional pleas is the seeming illogic and inconsistency in admitting one's guilt with a plea of guilty and at the same time reserving a right to appeal, which is equated with an assertion of innocence. However, a conditional plea is not quite the same thing as a guilty plea. A conditional plea expresses the defendant's qualified will to plead guilty only if a ruling adverse to him is affirmed on appeal. In such a choice there is more pragmatism and realism than illogic and inconsistency.

The probable result of allowing qualified pleas is an increase in appeals raising constitutional issues, and a decrease in trials where the prosecu-

tion builds an apparently overwhelming case in part on evidence of questioned admissibility. If so, then a rule allowing qualified pleas portends a trade-off in the workload of trial and appellate courts. If we as a Court elect not to make this trade, it should be, at least in part, because of its poor economies, and not on the grounds presently advanced by the rule's critics. For the proof of these economies we should look, not to presumptions and suppositions, but to the experience of our sister states who recognize qualified pleas.

We should, in addition, look closely at what is proposed to be traded. Where the defendant must go to trial to preserve an issue for appeal, and does so for this purpose only, the trial itself resolves no genuinely contested questions. It is wasted work on nonissues, with the real issue to be decided only on the subsequent appeal. There will, however, be some defendants who plead guilty and waive the only arguably meritorious question in the case in order to secure the benefits of a favorable plea bargain. These pleas save the appellate courts work. In short, the system saves the appellate courts work on the real questions at the cost of favorable plea bargains for defendants and pointless work for trial courts.

Where a conditional plea is taken the work and expense of trying nonissues is saved. However, the appellate courts will have the added work of deciding the issues which defendants do contest and on the outcome of which their pleas are conditioned.

To this writer, there is something preferable in an adjudicatory system which allocates its energies to the decision of contested questions rather than formal exercises.

I agree that a uniform policy should be made either by court rule or Supreme Court decision.

However, I do not agree that this Court, in the interim, should create by judicial opinion a uniform policy of not enforcing qualified pleas. Where the defendant and the prosecutor enter into a qualified plea, *Santobello v New York,* 404 US 257; 92 S Ct 495; 30 L Ed 2d 427 (1971), would seem to forbid our ignoring the qualification and treating the alleged errors as waived. The only other alternative to enforcing the plea and considering the issues would be to set the plea aside and remand for taking an unqualified plea, or for trial, in the parties' option. However, for the same considerations of judicial economy which move my Brother BRONSON to reach the merits here, I would prefer to enforce qualified pleas.

M. J. KELLY, J., concurs with M. F. CAVANAGH, P. J.