PEOPLE v NASH

Docket No. 78-5505. Submitted June 3, 1980, at Grand Rapids.— Decided October 20, 1981. Leave to appeal applied for.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence §§ 411-418.

Admissibility, in civil case, of evidence obtained by unlawful search and seizure. 5 ALR3d 670.

Modern status of rule governing admissibility of evidence obtained by unlawful search and seizure. 50 ALR2d 531.

[2] 29 Am Jur 2d, Evidence §§ 425-427.

[3, 22] 68 Am Jur 2d, Searches and Seizures §§ 35, 36.

[4, 5] 68 Am Jur 2d, Searches and Seizures § 52.

Admissibility of evidence discovered in warrantless search of rental property authorized by lessor of such property—state cases. 2 ALR4th 1173.

Authority to consent for another to search or seizure. 31 ALR2d 1078.

[5, 6] 68 Am Jur 2d, Searches and Seizures § 9.

Transiently occupied room in hotel, motel, or rooming house as within provision forbidding unreasonable searches and seizures. 86 ALR2d 984.

[7] 29 Am Jur 2d, Evidence § 415.

[8] 7 Am Jur 2d, Attorneys at Law §§ 118-182.

Party's waiver of privilege as to communications with counsel by taking stand and testifying. 51 ALR2d 521.

[9] 7 Am Jur 2d, Attorneys at Law § 54.

[10] 7 Am Jur 2d, Attorneys at Law §§ 119, 120.

[11] 29 Am Jur 2d, Evidence § 771.

[12] 7 Am Jur 2d, Attorneys at Law §§ 151, 152.

[13] 29 Am Jur 2d, Evidence §§ 320, 336-346.

[14] 29 Am Jur 2d, Evidence §§ 320, 324-326.

[15] 40 Am Jur 2d, Homicide §§ 12, 280, 281.

[16] 75 Am Jur 2d, Trial §§ 489, 491.

[17] 21A Am Jur 2d, Criminal Law § 782.

[18] 40 Am Jur 2d, Homicide § 53.

What constitutes "imminently dangerous" act within homicide statute. 67 ALR3d 900.

[19] 20 Am Jur 2d, Evidence § 375.

75 Am Jur 2d, Trial §§ 745, 747.

Fingerprints, palm prints, or bare footprints as evidence. 28 ALR2d 1115.

[20, 21, 23, 26] 68 Am Jur 2d, Searches and Seizures §§ 2, 4.

Carron L. Nash was convicted of second-degree murder in the shooting death of her husband, Douglas L. Nash, in Gladwin Circuit Court, Robert H. Campbell, J. Prior to the commencement of the trial, the trial judge denied the defendant's motion to suppress evidence obtained in a search without a warrant of a box located outside of the defendant's rented trailer in which the victim's body was concealed. The defendant appeals by leave granted alleging that (1) the evidence of the victim's body was obtained as a result of an illegal search and seizure, thus all the evidence resulting therefrom should have been suppressed, (2) she was denied her right to the effective assistance of counsel by her trial attorney's action in giving the police information resulting in the search of his office and seizure of evidence incriminating her, (3) the trial judge erred in allowing the prosecutor to introduce, for the sole purpose of proving that the defendant was an immoral person, evidence that she and the victim had previously swapped sexual partners with another couple, (4) the trial judge erred in allowing the prosecutor to introduce testimony that the defendant had lived with the victim while she was still married to her former husband and that the defendant had sexual relations with another man four weeks prior to trial, (5) the trial judge erred in denying her motion for a directed verdict as there was insufficient evidence of guilt to sustain her conviction of second-degree murder, and (6) that the trial court erred in not giving her requested jury instruction on fingerprint evidence. *Held:*

1. The defendant had a reasonable expectation of privacy in the box worthy of Fourth Amendment protection. There were insufficient exigent circumstances justifying an immediate search without a warrant of the box. As merely an owner of rented premises, Mrs. Ballard, who discovered the victim's body, had no authority to consent to the search of the trailer during the defendant's tenancy and the people did not prove that the defendant had intended to abandon the premises. Mrs. Ballard's private discovery did not validate the subsequent search and seizure without a warrant by the police. Admission of evidence of the corpse and of all of the evidence stemming from it was not harmless error in a murder prosecution based largely on circumstantial evidence. Evidence of the body of the victim and all evidence resulting therefrom should be suppressed on retrial as resulting from an illegal search and seizure.

2. The defendant's attorney had a duty to relinquish the

[24] 68 Am Jur 2d, Searches and Seizures §§ 33, 34, 37-59, 94, 96, 102, 103.

[25] 68 Am Jur 2d, Searches an Seizures §§ 49-53.

evidence incriminating the defendant to the authorities and did not violate the defendant's attorney-client privilege by doing so. The prosecutor should not be allowed to elicit testimony regarding the source of the evidence since permitting the prosecutor to show that the defendant's attorney had such evidence in his possession invites the jury to infer that the defendant gave the evidence to her attorney and such admission is clearly more prejudicial than probative.

3. The trial court did not abuse its discretion in holding that the evidence of the spouse-swapping incident and the victim's affair was more probative than prejudicial. Further, by connecting the spouse-swapping incident and the victim's affair with the evidence that the victim wanted a divorce but that the defendant did not want a divorce, the prosecutor established that evidence of motive was material to the defendant's guilt in the charged criminal transaction.

4. The issue of whether the trial judge erred in allowing the prosecutor to introduce testimony that the defendant had lived with the victim while she was still married to her former husband and that she had sexual relations with another man four weeks prior to trial was not objected to at trial and thus is not properly preserved for appeal.

5. It is sufficient if the prosecution proves its own theory beyond a reasonable doubt in the face of whatever contradictory evidence is also brought to light. The trial judge did not err in denying the defendant's motion for a directed verdict since there was sufficient evidence for a rational factfinder to reasonably infer that the defendant, upon sudden provocation, killed her husband.

6. The trial court did not err in refusing to give the requested instruction on fingerprint evidence since that instruction need only be given where the jury is asked to convict on the basis of fingerprint evidence alone.

Reversed and remanded.

J. T. KALLMAN, J., concurred in part and dissented in part. He would affirm the trial court's holding that the search of the box was not an illegal search and seizure since Mrs. Ballard, a private citizen, first found the body and the Fourth Amendment only protects citizens from illegal searches and seizures by government officials. He believed that the defendant did not have any legitimate expectation of privacy in the box. Furthermore, he considered that exigent circumstances (abandonment and consent) existed justifying the police search of the box, and that Mrs. Ballard, the landowner, had a co-equal interest with the defendant in the box to enable her to give valid consent to

the search of the box. He concurred with the majority opinion in that he believed that the defendant's attorney had a duty to relinquish the evidence incriminating the defendant to the authorities and that he did not violate the defendant's attorney-client privilege by doing so and that it would be error for the prosecution to elicit testimony regarding the source of that evidence.

## OPINION OF THE COURT

1. SEARCHES AND SEIZURES — BURDEN OF PROOF.

   The people have the burden of proving the reasonableness of any search and seizure by governmental officials and failure to sustain this burden will result in suppression of evidence of any fruits of the illegal search.

2. SEARCHES AND SEIZURES — SUPPRESSION OF EVIDENCE.

   A trial court's determination regarding the suppression of evidence obtained as a result of a search and seizure by government officials that the evidence is admissible will be reversed on appeal only where clearly erroneous.

3. SEARCHES AND SEIZURES — WARRANTS.

   A search without a warrant is per se unreasonable unless there exists both probable cause and circumstances establishing one of the delineated exceptions to the warrant requirement.

4. SEARCHES AND SEIZURES — CONSENT — LANDLORDS.

   A mere owner of rented premises, where there is no evidence of a right reserved under a lease to consent to a search of the premises, has no authority to consent to a search of the premises by police officers.

5. SEARCHES AND SEIZURES — ABANDONED PREMISES.

   A defendant does not have standing to challenge the seizure of evidence obtained from the search of rental property after he, the tenant, had abandoned the premises.

6. ABANDONED AND LOST PROPERTY — PRESUMPTIONS.

   Abandonment of leased premises will not be presumed but must be clearly shown by the party asserting it.

7. SEARCHES AND SEIZURES — CORPSES — MURDER.

   Admission in a murder trial of evidence of the corpse and of all of the evidence stemming from it where the evidence was obtained as a result of an illegal search and seizure is not harmless error in a prosecution based largely on circumstantial evidence.

8. ATTORNEY AND CLIENT — PRIVILEGE — WAIVER.

Communications made by a client to his attorney in confidence for the purpose of obtaining legal advice or opinion are privileged where an attorney-client relationship exists and although either may assert the privilege, only the client, and not the attorney, may waive the privilege.

9. ATTORNEY AND CLIENT — PRIVILEGE — FUTURE CRIMES.

The attorney-client privilege is inapplicable where the client seeks his attorney's advice regarding the commission of a future crime.

10. ATTORNEY AND CLIENT — PRIVILEGE.

Advice secured by a client from his attorney in aid of a legitimate defense against a charge of a past crime, even though he is guilty, is privileged.

11. ATTORNEY AND CLIENT — CRIMINAL LAW — EVIDENCE.

An attorney who is representing a criminal defendant is required to turn over physical evidence of the crime in his possession to the prosecution after withholding it for a reasonable period in order to conduct his own investigation.

12. CRIMINAL LAW — EVIDENCE — SOURCE OF EVIDENCE — PRIVILEGE.

Admission of evidence of the source of physical evidence of a crime obtained by an attorney who is representing a criminal defendant charged with the crime constitutes a violation of the client's attorney-client privilege.

13. EVIDENCE — CHARACTER EVIDENCE — RULES OF EVIDENCE.

Generally, evidence of the character of a person is not admissible to prove that he acted in conformity therewith; however, evidence of other crimes, wrongs, or acts may be admissible under certain conditions (MRE 404[a], [b]).

14. EVIDENCE — BAD ACTS — RULES OF EVIDENCE.

Evidence of a defendant's bad acts other than the charged offense is inadmissible unless it satisfies the following requirements: (1) there must be substantial evidence that the defendant actually perpetrated the bad act sought to be introduced; (2) there must be some special circumstances of the prior bad acts which tend to prove that the facts or circumstances of the other bad acts are probative of the defendant's motive, intent, absence of mistake or accident, scheme, plan or system in committing the charged offense; (3) the defendant's motive, intent, absence of mistake or accident, scheme, plan or system must be material

to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the evidence outweighs its prejudicial effect (MRE 404[b]).

15. HOMICIDE — MOTIVE — EVIDENCE.

Proof of motive in a murder prosecution, while not required, is always relevant.

16. CRIMINAL LAW — DIRECTED VERDICT.

The standard to be used in reviewing a denial of a criminal defendant's motion for a directed verdict is that in considering the evidence in a light most favorable to the prosecution, the reviewing court must determine whether there was sufficient evidence of each element of the offense charged such that a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.

17. CRIMINAL LAW — BURDEN OF PROOF.

It is sufficient if the prosecution proves its own theory beyond a reasonable doubt in the face of whatever contradictory evidence is also brought to light in a criminal trial; it is not essential that the prosecution specifically disprove all innocent theories.

18. HOMICIDE — SECOND-DEGREE MURDER.

There must be evidence that there was a killing, that the accused killed with malice aforethought but without premeditation and deliberation, that the accused formed an intent to kill upon a sudden provocation prior to and accompanying the act, and that such provocation did not foreclose the exercise of reason and thus reduce the crime from murder to manslaughter to sustain a conviction of second-degree murder.

19. EVIDENCE — FINGERPRINT EVIDENCE — JURY INSTRUCTIONS.

The jury should be instructed that to warrant a conviction, the fingerprints corresponding to those of the accused must have been found in the place where the crime was committed under such circumstances that they could only have been impressed at the time the crime was committed where the jury is asked to convict on the basis of fingerprint evidence alone.

PARTIAL CONCURRENCE AND PARTIAL DISSENT BY J. T. KALLMAN, J.

20. SEARCHES AND SEIZURES — WARRANTS.

*Ownership alone is not sufficient to establish a reasonable and legitimate expectation of privacy to determine the validity of a search and seizure without a warrant; ownership is relevant to the inquiry, but total circumstances determine whether one*

*challenging the search has a reasonable expectation of privacy in the locus of the search.*

21. SEARCHES AND SEIZURES — CONSTITUTIONAL LAW.

*The Fourth Amendment to the United States Constitution protects citizens against illegal searches by the government, not private citizens (US Const, Am IV).*

22. SEARCHES AND SEIZURES — WARRANTS.

*There is a presumption that a search of private property by governmental agents without a warrant is per se unreasonable unless the search falls within one of the clearly delineated exceptions to the warrant requirement.*

23. SEARCHES AND SEIZURES — WARRANTS.

*The ultimate test of the reasonableness of a search without a warrant by government officials is whether property was searched in which the complainant had a reasonable expectation of privacy from governmental intrusion.*

24. SEARCHES AND SEIZURES — WARRANTS.

*The six exceptions to the requirement that government officials obtain a warrant before they search the property of another are (1) searches incident to lawful arrest, (2) automobile searches and seizures, (3) the plain view doctrine, (4) consent, (5) stop and frisk (reasonable suspicion required), and (6) hot pursuit.*

25. SEARCHES AND SEIZURES — CONSENT — CO-EQUAL INTEREST IN PROPERTY.

*A person other than the defendant with a co-equal interest in property with the defendant may validly consent to a search of that property even though the defendant does not consent to the search.*

26. CONSTITUTIONAL LAW — FOURTH AMENDMENT.

*The applicability of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable", "reasonable", or "legitimate" expectation of privacy that has been invaded by government action (US Const, Am IV).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Joseph McCarthy,* Prosecuting Attorney, and *Leonard J. Malinowski,* Assistant Attorney General, for the people.

*Chari Grove,* Assistant State Appellate Defender, for defendant on appeal.

Before: R. B. Burns, P.J., and MacKenzie and J. T. Kallman,* JJ.

MacKenzie, J. On August 27, 1975, defendant Carron Lea Nash was convicted of second-degree murder, MCL 750.317; MSA 28.549, in the shooting death of her husband, Douglas Leon Nash. She was sentenced to life imprisonment and appeals by leave granted.

Prior to the commencement of trial, defendant moved to suppress evidence obtained from a search without a warrant of a box located outside of defendant's rented trailer which uncovered the victim's body. The trial court denied this motion. Following this denial, defendant renewed the motion to suppress on August 4, 1975. A hearing was held on August 7, 1975, and, at its conclusion, defendant's motion was again denied.

At the suppression hearing on August 7, 1975, testimony was taken from Margaret Ballard and Sheriff Walter E. Scott. Mrs. Ballard testified that she and her husband owned land and a trailer which they had rented to defendant and her husband. She stated that on the afternoon of January 21, 1975, at approximately 3 p.m., she deliberately went to the trailer when she knew defendant was at work because she suspected a body might be found there. Mrs. Ballard testified that her husband had removed a box from the trailer the night before to a place directly outside the trailer and had told her to check it because it smelled and he thought it might contain meat scraps. Mrs. Ballard testified that the lid of the box was slightly· ajar

---

* Circuit judge, sitting on the Court of Appeals by assignment.

and when she looked inside she thought she saw a badly decomposed body which she believed to be Douglas Nash.

At the preliminary examination, Mrs. Ballard testified as follows regarding her discovery:

"I just lifted a small portion of it at first. And, then I thought possibly it was maybe a cowhide or something. And, then I just stood there thinking it—and, I figured I had to know for sure before. So I opened it up and looked. And probably not more than five minutes [elapsed]."

She said she then proceeded to the Gladwin County Sheriff's Department and, speaking to Undersheriff Ralph Covill, "I said I'd found a body, that it looked black and it looked like Douglas Nash". She said she could tell because she "could see his face". Mrs. Ballard testified that Officer Covill summoned Sheriff Walter E. Scott, whom she also told about the box containing the body and of her suspicion that it was Douglas Nash. She said she told the sheriff that she owned the property, but could not recall whether she told him at the police station or at the scene of the search. Mrs. Ballard testified that she returned with the sheriff and a deputy to the trailer and that the officers searched the box. She said that later that night the officers asked her husband for a key and permission to search the trailer.

Mrs. Ballard testified that until this discovery, even though the Nashes were two to three weeks behind in their rent, she had not done anything to terminate the tenancy relationship, and she had then considered the Nashes to be tenants. In fact, Mrs. Ballard testified at the preliminary examination that defendant had paid part of the arrearage earlier on the day the body was discovered and

had phoned her saying she still wanted to rent the trailer.

Sheriff Scott testified that Undersheriff Covill told him a woman had come in and said there might be a body, bones (from an animal), or hides in a box by a trailer on McCulloch Road. Sheriff Scott said he recognized the complainant as Mrs. Ballard and he followed her to the property. He said he talked to Mrs. Ballard only briefly at the station and did not then ascertain her relationship to the property. Sheriff Scott stated that when they arrived at the trailer, Mrs. Ballard told him she and her husband owned the property and were renting it. According to the officer, Mrs. Ballard told him that her husband had shown someone the trailer the night before for the purpose of renting it because the present tenants were behind in rental payments and that her husband had placed the box outside the trailer. Sheriff Scott testified that he observed no evidence of a crime until actually ripping open the box and finding the body inside.

The people have the burden of proving the reasonableness of any search and seizure. *People v White,* 392 Mich 404; 221 NW2d 357 (1974), *People v Siegel,* 95 Mich App 594, 601; 291 NW2d 134 (1980). Failure to sustain this burden will result in suppression of evidence of any fruits of the illegal search. *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961). However, the trial court's determination at a suppression hearing that the evidence is admissible will be reversed only where clearly erroneous. *Siegel, supra,* 602.

Initially, we hold that defendant had a reasonable expectation of privacy in the box, when moved outside the trailer but within the curtilage, worthy of Fourth Amendment protection. *United*

*States v Molkenbur,* 430 F2d 563 (CA 8, 1970), *cert den* 400 US 952; 91 S Ct 244; 27 L Ed 2d 258 (1970). See, generally, *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967).

A search without a warrant is, per se, unreasonable unless there exists both probable cause and circumstances establishing one of the delineated exceptions to the warrant requirement. *People v Reed,* 393 Mich 342, 362; 224 NW2d 867 (1975). Mrs. Ballard's statement that she had observed a dead body in a box on the premises gave the police probable cause to believe that a crime had been committed and that evidence of the crime could be found on the premises.

There were, however, insufficient exigent circumstances justifying an immediate warrantless search. Had the police further questioned Mrs. Ballard, they would have ascertained that defendant worked the afternoon shift from 3 p.m. until 11 p.m. and would not be returning to the trailer for at least seven hours. Mrs. Ballard had not alerted defendant regarding her discovery of the body; therefore, there was no reason to believe defendant would conceal, remove, or destroy evidence during the time necessary to procure a warrant. See *Coolidge v New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971). The evidence was inadmissible under the "plain view" doctrine as Sheriff Scott testified that he was unable to observe any evidence of a crime until trespassing on the premises and actually ripping open the box and looking inside. See *Coolidge, supra,* 465-468.

As merely the owner of rented premises, Mrs. Ballard had no authority to consent to the search of the trailer during the tenancy. *Chapman v United States,* 365 US 610; 81 S Ct 776; 5 L Ed 2d

828 (1961), *Stoner v California,* 376 US 483; 84 S
Ct 889; 11 L Ed 2d 856 (1964). There was no
evidence that the Ballards had reserved the right
under a lease to consent to a search of the prem-
ises. The people's contention that the Ballards had
common control of the premises is not supported
by the evidence.

The prosecutor further argues that the Ballards
could give valid consent to the search because the
tenants had abandoned the premises. Clearly, a
finding of abandonment deprives a defendant of
standing to challenge the seizure of the evidence.
*People v Kirchoff,* 74 Mich App 641, 645; 254
NW2d 793 (1977). The *Kirchoff* Court cited with
approval the definition of abandonment in *Fried-
man v United States,* 347 F2d 697, 704 (CA 8,
1965):

"Abandonment is an ultimate fact or conclusion
based generally upon a combination of *act and intent.*
How did the person who was supposed to have aban-
doned the property act, that is, what did he do, and,
second, what was his intention? These call for factual
determinations. *Friedman, supra,* 704. (Emphasis sup-
plied.)" 74 Mich App 641, 646.

In *United States v Robinson,* 430 F2d 1141, 1143
(CA 6, 1970), similar factually to the case at bar,
the Court refused to infer defendant's intent to
abandon his apartment from his mere absence
from the premises:

"While the intent of one in possession of property
often cannot be directly shown but must be inferred
from his actions, abandonment will not be presumed. It
must be clearly shown by the party asserting it. *Cole-
man v Maxwell,* 387 F2d 134, 135 (CA 6, 1967), *cert den*
393 US 1007; 89 S Ct 492; 21 L Ed 2d 472 (1968);

*Friedman v United States, supra; Linscomb v Goodyear Tire & Rubber Co,* 199 F2d 431, 435 (CA 8, 1952)."

Although there was some evidence that the Ballards thought defendant and her husband may have moved, Mr. Ballard's testimony indicated that some of the tenants' belongings were still on the premises when he went to the trailer on January 20, 1974. Moreover, Mrs. Ballard testified that defendant phoned her the next day, before Mrs. Ballard found the body, stating that defendant had left part of the back rent at Mr. Ballard's place of business and that she wished to continue renting the trailer. Mrs. Ballard also testified that even though the Nashes were a few weeks behind in rental payments, she still considered them tenants as of the day of the search and had done nothing to terminate the tenancy. In view of these circumstances, the people have not satisfied their burden of proving that defendant intended to abandon the premises.

Finally, the prosecutor argues that Mrs. Ballard's "private-citizen" discovery of the corpse is beyond the purview of Fourth Amendment unreasonable search considerations, citing *People v Langley,* 63 Mich App 339; 234 NW2d 513 (1975), *People v Harry Smith,* 31 Mich App 366; 188 NW2d 16 (1971). We agree that Mrs. Ballard discovered the body while acting as a private citizen; however, her initial discovery does not validate the subsequent search and seizure without a warrant by the police. In *Burdeau v McDowell,* 256 US 465, 475; 41 S Ct 574, 576; 65 L Ed 1048, 1051 (1921), the Supreme Court emphasized that the search and the resulting seizure was done by private citizens without government involvement:

"The 4th Amendment gives protection against unlaw-

ful searches and seizures, and, as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the 4th Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued.

"In the present case the record clearly shows that no official of the Federal government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after the property had been taken from him and was in the possession of the Cities Service Company. It is manifest that there was no invasion of the security afforded by the 4th Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another. A portion of the property so taken and held was turned over to the prosecuting officers of the Federal government. We assume that petitioner has an unquestionable right of redress against those who illegally and wrongfully took his private property under the circumstances herein disclosed, but with such remedies we are not now concerned."

If Mrs. Ballard had turned the evidence over to the police under circumstances not requiring them to trespass on defendant's property or open containers in which defendant had a legitimate expectation of privacy, we would agree that *Burdeau* would apply. Unfortunately, the record before us reveals an illegal, warrantless search and seizure by governmental officials. Nor can we agree that the evidence was overwhelming in favor of guilt even without the illegal evidence. Certainly, admission of evidence of the corpse, and of all of the evidence stemming from it, was not harmless error in a murder prosecution based largely on circum-

stantial evidence. Therefore, we conclude that evidence of the body of the deceased and all evidence resulting therefrom must be suppressed on retrial as resulting from an illegal search and seizure.

The next issue is whether defendant was denied her Sixth Amendment right to effective assistance of counsel by her trial attorney's action in giving the police information resulting in the search of his office and seizure of evidence incriminating her. During the course of the homicide investigation, the police obtained a warrant allowing them to search the office of defendant's trial counsel, Joseph McCarthy. In obtaining the warrant, the police relied upon the following affidavit:

"Affiant has been informed by letter from the law firm of Kreckman and McCarthy that the aforementioned items are in their possession, that said items are valuable as evidence in the matter of the *People of the State of Michigan v Carron Lea Nash,* whom said firm represent, and must be seized as such evidence."

Upon executing the warrant, the police were led downstairs by Mr. McCarthy and shown two bags, one containing a wallet with the driver's license of the deceased and the other a revolver, holster, and ammunition. The revolver was linked with bullets found in the body of the deceased and a fingerprint on one cartridge was identified as belonging to defendant. There was no testimony regarding the source from which defense counsel had received the evidence; however, it was elicited at trial that the evidence was procured pursuant to a search of the defense attorney's office.

Since our disposition of the first issue necessitates retrial, we will not consider the alleged ineffectiveness of defendant's trial counsel. For purposes of retrial, however, we must decide

whether defendant's attorney-client privilege was violated and, if so, whether the evidence obtained must be suppressed.

The general rule is that where an attorney-client relationship exists, communications made by the client to his or her attorney in confidence for the purpose of obtaining legal advice or opinion are privileged. Furthermore, though either may assert the privilege, only the client and not the attorney, may waive the privilege. *Alderman v People,* 4 Mich 414, 421-422 (1857). This rule has not been without exception. In *People v VanAlstine,* 57 Mich 69, 78-79; 23 NW 594 (1885), the Court held that the privilege was inapplicable where the client had sought his attorney's advice regarding the commission of a (future) crime:

"The counsel for respondent then moved to strike out the testimony, on the ground that it was privileged; which motion the court overruled. The counsel insists that this was error, and in support they cite us to *Alderman v People,* 4 Mich 414-422 [1857]; *Hamilton v People,* 29 Mich 173 [1874]; and *Passmore v Passmore,* 50 Mich 626 [16 NW 170 (1883)]. These cases lay down the rule, everywhere recognized, that the privilege is the privilege of the client, and not of the attorney, and may be waived by him. But there are exceptions to the general rule, based upon public policy and public security. Professional communications are not privileged when such communications are for an unlawful purpose, having for their object the commission of a crime. They then partake of the nature of a conspiracy, or attempted conspiracy, and it is not only lawful to divulge such communications, but under certain circumstances it might become the duty of the attorney to do so. The interests of public justice require that no such shield from merited exposure shall be interposed to protect a person who takes counsel how he can safely commit a crime. The relation of attorney and client cannot exist for the purpose of counsel in concocting

crimes. The privilege does not exist in such cases. 1 Gilb
Ev 27'ı; *Greenough v Gaskell,* 1 Mylne & K 98; *Coveney
v Tannahill,* 1 Hill (NY) 33; *Bank of Utica v Mersereau,*
3 Barb Ch 528; *People v Blakeley,* 4 Park Cr Rep 176; 1
Whart Cr L, § 773; Roscoe's Cr Ev 150."

In contrast, it is well established that advice
secured by a client in aid of a legitimate defense
against a charge of a *past* crime, even though he is
guilty, is privileged. McCormick, Evidence (2d ed),
§ 95, pp 199-200, *Alderman v People, supra.* The
factual situation herein, where the attorney ob-
tains physical evidence of the crime, is somewhat
distinguishable from the case where he merely
receives communications from his client regarding
past criminal activity. Although, admittedly, there
exists only a fine line between the two situations,
courts in several jurisdictions which have consid-
ered this question have not hesitated to sanction
attorneys who have assisted clients in concealing
or destroying physical evidence of the crime
charged.

The Court in *In re Ryder,* 381 F2d 713, 714 (CA
4, 1967), affirming the district court's order sus-
pending attorney Richard R. Ryder from the prac-
tice of law in federal court for 18 months and
adjudging him guilty of professional misconduct,
found that his actions in attempting to conceal
evidence of a bank robbery committed by his client
were not entitled to protection by the attorney-
client privilege:

"In the course of his representation of an individual
suspected of bank robbery, Ryder transferred from that
person's safe deposit box to his own, stolen money and a
sawed-off shotgun, in violation of state and federal law.
At least one purpose, avowed by Ryder, was to conceal
the articles and thereby avoid the presumption of guilt
which would arise if the money and the weapon were

found in the client's possession. Viewed in any light, the facts furnished no basis for the assertion of an attorney-client privilege. It is an abuse of a lawyer's professional responsibility knowingly to take possession of and secrete the fruits and instrumentalities of a crime. Ryder's acts bear no reasonable relation to the privilege and duty to refuse to divulge a client's confidential communication. Ryder made himself an active participant in a criminal act, ostensibly wearing the mantle of the loyal advocate, but in reality serving as accessory after the fact."

In *State v Olwell,* 64 Wash 2d 828; 394 P2d 681, 684 (1964), the Washington Supreme Court held that the attorney-client privilege and privilege against self-incrimination must be balanced against the public's interest in the criminal investigation process. In *Olwell,* attorney David H. Olwell had been served with a subpoena *duces tecum* requiring that he produce, at a coroner's inquest, any knives in his possession belonging to his client who had been charged with murder. Olwell refused to state whether he had any such knives in his possession, asserting the attorney-client privilege. In initially holding the subpoena defective, the Court noted that by naming the client and requiring Olwell to produce physical evidence received from that client, the attorney was essentially required to testify against the client without the latter's consent in violation of the privilege. Notwithstanding, the Court held that Olwell was required to turn over physical evidence of the crime to the prosecution after withholding it for a reasonable period in order to conduct his own investigation:

"We do not, however, by so holding, mean to imply that evidence can be permanently withheld by the attorney under the claim of the attorney-client privilege. Here, we must consider the balancing process

between the attorney-client privilege and the public interest in criminal investigation. We are in agreement that the attorney-client privilege is applicable to the knife held by appellant, but do not agree that the privilege warrants the attorney, as an officer of the court, from withholding it after being properly requested to produce the same. The attorney should not be a depository for criminal evidence (such as a knife, other weapons, stolen property, etc.), which in itself has little, if any, material value for the purposes of aiding counsel in the preparation of the defense of his client's case. Such evidence given the attorney during legal consultation for information purposes and used by the attorney in preparing the defense of his client's case, whether or not the case ever goes to trial, could clearly be withheld for a reasonable period of time. It follows that the attorney, after a reasonable period, should, as an officer of the court, on his own motion turn the same over to the prosecution.

"We think the attorney-client privilege should and can be preserved even though the attorney surrenders the evidence he has in his possession. The prosecution, upon receipt of such evidence from an attorney, where charge against the attorney's client is contemplated (presently or in the future), should be well aware of the existence of the attorney-client privilege. Therefore, the state, when attempting to introduce such evidence at the trial, should take extreme precautions to make certain that the source of the evidence is not disclosed in the presence of the jury and prejudicial error is not committed. By thus allowing the prosecution to recover such evidence, the public interest is served, and by refusing the prosecution an opportunity to disclose the source of the evidence, the client's privilege is preserved and a balance is reached between these conflicting interests. The burden of introducing such evidence at a trial would continue to be upon the prosecution." (Footnotes omitted.)

See also *People v Lee,* 3 Cal App 3d 514; 83 Cal Rptr 715 (1970), *Morrell v Alaska,* 575 P2d 1200 (1978).

We adopt the reasoning of the Court in *Olwell*
and hold that defendant's attorney had a duty to
relinquish the evidence to the authorities and that
he did not violate defendant's attorney-client privi-
lege by doing so. At defendant's trial, however,
over objection, a police officer testified that the
evidence had been obtained pursuant to a search
of Mr. McCarthy's office. Under the standard an-
nounced in *Olwell*, which we adopt herein, reveal-
ing the source of the evidence violated defendant's
attorney-client privilege. Requiring defendant's at-
torney to turn in the evidence and then permitting
the prosecutor to show that defendant's attorney
had such evidence in his possession invites the
jury to infer that defendant gave the evidence to
her attorney. The prosecutor should not be allowed
to accomplish by inference what he is clearly
prohibited from doing by direct proof. Moreover,
revealing the source of the evidence is clearly
more unfairly prejudicial than probative in the
factual situation herein. MRE 403. On retrial, the
burden of admitting the evidence itself is still
upon the prosecution. We further caution the pros-
ecution against any mention whatsoever that the
evidence was formerly in the possession of defen-
dant or her attorney. Accord, *Anderson v State*,
297 So 2d 871 (Fla App, 1974).

Defendant next alleges that the trial judge erred
in allowing the prosecutor to introduce, for the
sole purpose of proving that defendant was an
immoral person, evidence that she and the victim
had previously swapped sexual partners with Judy
and David Sturgeon. Defendant's claim of error
relies on MRE 403 and 404(a).

As a general proposition, evidence of the charac-
ter of a person is not admissible to prove that he
acted in conformity therewith. MRE 404(a). How-

ever, evidence of other crimes, wrongs, or acts may be admissible under the conditions outlined in MRE 404(b):

"Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crime, wrongs, or acts are contemporaneous with, or prior or subsequent to the crime charged."

See also MCL 768.27; MSA 28.1050.

The prosecutor contends that evidence of the Nashes' and Sturgeons' sexual activities was admissible under MRE 404(b) to show motive; that the victim "was a swinger whose actions tortured and frustrated defendant" and that defendant loved her husband and refused to give him a divorce.

In support of this theory, the following evidence was admitted. Judy Sturgeon testified that she met the Nashes through her then husband, David Sturgeon. Soon thereafter, Judy Sturgeon and Douglas Nash began having sexual relations. In November, 1973, during this affair between Judy Sturgeon and Douglas Nash, the two couples swapped sexual partners on one occasion. There was an objection to this evidence at trial. Also in November, 1973, the deceased told defendant that he wanted a divorce and defendant was very upset and told Judy Sturgeon that she loved her husband and did not want to give him a divorce. Further testimony revealed that throughout Thanksgiving weekend in 1973, defendant and the victim were arguing concerning a divorce and another woman.

In order for the evidence of the spouse-swapping incident to be admissible under MRE 404(b), the criteria from *People v Wilkins,* 82 Mich App 260, 267-273; 266 NW2d 781 (1978), *rev'd on other grounds* 408 Mich 69; 288 NW2d 583 (1980), must be satisfied, namely: (1) there was substantial evidence that defendant actually perpetrated the bad act sought to be introduced; (2) there are special circumstances of the prior bad act tending to prove one of the statutory items—motive, in connection with the commission of the charged offense; (3) defendant's motive must be material to the determination of her guilt of the charged offense; and (4) the probative value of the evidence outweighs its prejudicial effect.

In the case at bar, there was substantial evidence from the testimony of both David and Judy Sturgeon that defendant and the victim participated in the spouse-swapping incident. It has been held that in a murder prosecution proof of motive, while not required, is always relevant. *People v Mihalko,* 306 Mich 356, 361; 10 NW2d 914 (1943). Motive was clearly in dispute here since there were no actual eyewitnesses to the killing and it was intimated that David Sturgeon had a strong motive and the opportunity to murder the victim. By connecting the spouse-swapping incident and the victim's affair with Judy Sturgeon with the evidence that the victim wanted a divorce but that defendant did not want a divorce, the prosecutor established that evidence of motive was material to defendant's guilt in the charged criminal transaction. We also find that the trial court did not abuse its discretion in holding that the evidence of the spouse-swapping incident and the victim's affair was more probative than prejudicial.

Defendant also argues that the trial judge erred

in allowing the prosecutor to introduce testimony that the defendant had lived with the victim while she was still married to her former husband and that defendant had sexual relations with David Sturgeon four weeks prior to trial. Defendant did not object to this evidence at trial, and, therefore, the issue is not properly before us. For purposes of retrial, however, we note that the evidence that the defendant and the victim engaged in illicit sexual relations before their marriage has little, if any, probative value on defendant's motive in the charged crime. Unless the prosecution can show that this evidence and the evidence of defendant's sexual relations with David Sturgeon after the death of the victim are admissible under the criteria of MRE 404(b), outlined above, the evidence should be excluded as character evidence impermissibly used to show conduct.

Defendant next contends that the trial judge erred in denying her motion for a directed verdict as there was insufficient evidence of guilt to sustain her conviction of second-degree murder. The thrust of defendant's argument is that (1) the prosecutor's case was premised almost entirely on circumstantial evidence, (2) the circumstantial evidence at trial equally implicated David Sturgeon as the killer of the deceased, and (3) in order for the prosecutor to withstand a directed verdict challenge where the state's case is based on circumstantial evidence, the prosecutor must prove "that there is no innocent theory possible which will, without violation of reason, accord with the facts", *People v Davenport,* 39 Mich App 252, 256; 197 NW2d 521 (1972).

The *Davenport* rule has recently been the subject of criticism. The standard to be used in reviewing a denial of a defense motion for a directed

verdict was clarified in *People v Hampton,* 407
Mich 354, 368; 285 NW2d 284 (1979); that is, in
considering the evidence in a light most favorable
to the prosecution, the reviewing court must deter-
mine whether there was sufficient evidence of each
element of the offense charged such that a rational
trier of fact could have found that the essential
elements of the crime were proven beyond a rea-
sonable doubt. The standard adopted in *Hampton*
was derived from the United States Supreme
Court opinion in *Jackson v Virginia,* 443 US 307;
99 S Ct 2781; 61 L Ed 2d 560 (1979). In *Jackson,*
the Supreme Court was considering the sufficiency
of the evidence of premeditation in a first-degree
murder conviction. In finding the evidence suffi-
cient, the Court noted:

"Only under a theory that the prosecution was under
an affirmative duty to rule out every hypothesis except
that of guilt beyond a reasonable doubt could this
petitioner's challenge be sustained. That theory the
Court has rejected in the past. *Holland v United States,*
348 US 121, 140; 99 L Ed 150; 75 S Ct 127 [1954]. We
decline to adopt it today." *Jackson, supra,* 326.

For the reasons stated in *People v Edgar,* 75
Mich App 467, 473-474; 255 NW2d 648 (1977), we
agree that the *Davenport* rule "is defective to the
extent that it treats circumstantial evidence differ-
ently than direct evidence and to the extent that it
requires the prosecution to *specifically* disprove all
innocent theories". Accordingly, we hold that it is
sufficient if the prosecution proves its own theory
beyond a reasonable doubt, *Hampton, supra,* in the
face of whatever contradictory evidence is also
brought to light. *Edgar, supra,* 474. Accord, *People
v Walker,* 93 Mich App 189; 285 NW2d 812 (1979).

To sustain a conviction of second-degree murder,

"there must be evidence that there was a killing, that the accused killed with malice aforethought but without premeditation and deliberation, that the accused formed an intent to kill upon a sudden provocation prior to and accompanying the act, and that such provocation did not foreclose the exercise of reason and thus reduce the crime from murder to manslaughter". *People v Stanek,* 61 Mich App 573, 577; 233 NW2d 89 (1975).

The evidence introduced at trial showed that Douglas Nash's body was discovered on January 21, 1974, in a box next to the trailer he shared with his wife, the defendant. Medical testimony established that the victim had been dead for approximately two months and that the cause of death was two bullets, one entering the back and piercing the heart and the other entering the abdomen and also piercing the heart. Roy Rowe, a friend of the Nashes, testified that he last saw the victim alive on Thanksgiving Day, 1973, in Ohio. Rowe further testified that the victim and defendant were arguing throughout the weekend about a divorce and another woman. Rowe also testified that the victim told him that defendant had tried to run him over in a parking lot. On December 2, 1973, Mrs. Ballard, defendant's landlord, was told by defendant that the victim had left the premises but that she wanted to continue renting the trailer. On December 21, 1973, defendant removed her husband's name from their automobile insurance policy. Defendant also told Mrs. Ballard in early January of 1973 to stay away from the trailer and that she would take care of the dogs. Further evidence established that the revolver seized from defendant's attorney's office matched the bullets found in the victim's body. When secured by the police, the revolver was loaded except

for two spent shells in the cylinder. Also, one bullet found with the bag of ammunition in defendant's attorney's office had defendant's prints on it. From this evidence plus the testimony of the Sturgeons regarding Judy Sturgeon's affair with Douglas Nash and defendant's unwillingness to agree to a divorce, a rational factfinder could reasonably infer that defendant, upon sudden provocation, killed her husband.

Defendant alleges error in the trial court's refusal to instruct on fingerprint evidence in accordance with *People v Cullens,* 55 Mich App 272, 275; 222 NW2d 315 (1974), quoting *People v Ware,* 12 Mich App 512, 515; 163 NW2d 250 (1968), to wit:

"To warrant a conviction, the fingerprints corresponding to those of the accused must have been found in the place where the crime was committed under such circumstances that they could only have been impressed at the time the crime was committed."

The above instruction need only be given where the jury is asked to convict on the basis of fingerprint (or footprint) evidence alone. *People v Willis,* 60 Mich App 154; 230 NW2d 353 (1975). That is not the case herein. Defendant's other instructional errors need not be addressed due to our disposition of issues one and two.

Reversed and remanded for a new trial in accordance with this opinion.

R. B. BURNS, P.J., concurred.

J. T. KALLMAN, J. *(concurring in part and dissenting in part).* I respectfully dissent as to the search and seizure issue and concur as to the issue

of improper questioning by the prosecuting attorney.

A review of the record indicates that far too much importance was placed on Mrs. Ballard's testimony that she considered Carron Lea Nash as still being her tenant.

Ownership alone is not enough to establish a reasonable and legitimate expectation of privacy to determine validity of a search or seizure without a warrant. Ownership is relevant to the inquiry, but the *total circumstances* determine whether one challenging the search has a reasonable expectation of privacy in the locus of the search. *United States v Ramapuram,* 632 F2d 1149 (CA 4, 1980).

This analysis from the *Ramapuram* case makes sense. Analyzing this issue in this case one learns that the defendant had permitted the owners of the property to show the trailer to prospective renters. In the trailer, the owners found a box that smelled. So they cleaned the trailer up by removing the box and placing it outside of the trailer. It was only thereafter that Mrs. Ballard looked inside the box. She saw a body. She, a private citizen, found the body. Thereafter, she went and got the sheriff. Mrs. Ballard had become suspicious of a body being in the box and reported it to the sheriff. There is no protection under the Fourth Amendment against the search and seizure of property by a private citizen. That is the case here. The private citizen removed the box from the trailer, looked in it, found a body in it, and immediately contacted the sheriff to investigate further. These are the actions of a responsible citizen.

The first issue we must address is whether or not there is a Fourth Amendment issue at all.

Here, Nash, behind in her rent, leaves the trailer and permits Mr. and Mrs. Ballard to show

it to potential renters. Mr. and Mrs. Ballard took steps to do this. However, while in the trailer the night before, Mr. Ballard removed the box from inside the trailer because it smelled. Mrs. Ballard, a private citizen, looked inside the box and saw a badly decomposed body which she believed to be Douglas Nash. The search had been completed and the body discovered. The evidence had been located by a private citizen. The Fourth Amendment protects citizens against illegal searches by the government, not private citizens. In this case, the initial search and discovery of evidence was done by a private citizen. It was thereafter that this evidence was brought to the attention of the sheriff.

It is clear from the totality of the circumstances in this case that Mrs. Nash did not expect or have any legitimate expectation of privacy in the box. If she did, why did she permit the owners to show the trailer, move some of her personal belongings out, and then try to rent the trailer? One can only answer that as to the Ballards she expected no privacy. Mrs. Ballard then searched and found the body. Thereafter, the governmental agency (the sheriff) appeared on the scene for the first time.

Not only is this testimony present in the record, but we find further that defendant's two dogs were removed from the premises prior to January 20, 1974, the defendant testified that she had stayed at the trailer only one night since her husband had left, Mrs. Ballard had "put Carron's things together * * * in a plastic bag", Mr. Covill testified that he helped Carron move some of her things from the trailer at her request, and that she (defendant) wasn't living there as far as he knew, Hazel Finch saw someone putting clothes in a car on January 18, and finally, that defendant's

own father, Harold Falconberry, testified that his daughter moved in with him prior to Christmas, 1973. All of this evidence points to an abandonment of the trailer. Weighing all of this evidence against the single statement that Mrs. Ballard still considered defendant her tenant, one comes to the conclusion that defendant had voluntarily abandoned her possessory rights to the trailer. But beyond this is one conclusive piece of evidence that cements this position and that is contained in the testimony of Richard A. Mathews, Deputy Medical Examiner. When he asked the defendant about her address, she gave her father's address, 5422 Merrill Road, where she was living, and not the trailer address, 175 McCulloch.

From this record I am satisfied that defendant's conduct and words removed from her any reasonable expectation of privacy. Under any reasonable analysis, one must recognize that the people showing the trailer would (1) throw away a smelly box without opening it, (2) remove it from the trailer without opening it, or (3) remove it from the trailer and open it to see what caused the smell. Any curious human being, which we all are, would want to know what was causing the bad smell. Under these circumstances, the Fourth Amendment right does not even exist as a private citizen made the initial search and find.

So from this record one does not even reach a Fourth Amendment issue. Therefore, I would affirm on this issue.

Assuming, *arguendo,* that a Fourth Amendment right exists, however, the facts, even as set forth in the majority opinion, leave me with the impression that exigent circumstances (abandonment and consent) existed. However, I decline to hold that the seriousness of the offense under investigation

itself creates exigent circumstances of the kind that under the Fourth Amendment justify a search without a warrant. *Mincey v Arizona,* 437 US 385, 394; 98 S Ct 2408, 2415; 57 L Ed 2d 290 (1978).

Nevertheless, an extensive examination of recent Michigan and federal cases leads one to the conclusion that, assuming a search without a warrant occurred in the instant case, this does not compel the suppression of the evidence so obtained.

The Fourth Amendment prohibits unreasonable searches and seizures of "persons, houses, papers and effects". It is undisputed that the *final* discovery of the badly decomposed body of the victim resulted from a search and seizure by a law enforcement officer without a warrant. However, one must remember that the initial discovery was made by a private citizen and subsequently reported to the authorities.

Because of the strong preference in favor of search warrants, there is a presumption that a search of private property without a warrant is per se unreasonable, unless the search falls within one of the clearly delineated exceptions to the warrant requirement. *Coolidge v New Hampshire,* 403 US 443, 454-455; 91 S Ct 2022, 2031; 29 L Ed 2d 564 (1971), *Mancusi v DeForte,* 392 US 364, 370; 88 S Ct 2120, 2124; 20 L Ed 2d 1154 (1968), *Katz v United States,* 389 US 347, 357; 88 S Ct 507, 514; 19 L Ed 2d 576 (1967).

Whether a search and seizure is actually unreasonable depends on the facts and circumstances of each case. *Cooper v California,* 386 US 58, 59; 87 S Ct 788, 789; 17 L Ed 2d 730 (1967). The ultimate test of the reasonableness of a search without a warrant, however, is whether property was

searched in which the complainant had a reasonable expectation of privacy from governmental intrusion. *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967).

The six exceptions to the warrant requirements have been carefully scrutinized by volumes of case law. These exceptions are as follows:

(1) Searches incident to lawful arrest.

(2) Automobile searches and seizures.

(3) Plain view doctrine.

(4) Consent.

(5) Stop and frisk (reasonable suspicion required).

(6) Hot pursuit.

But before the exceptions can be examined, the threshold questions must be answered satisfactorily. This is so because under *Rakas v Illinois,* 439 US 128; 99 S Ct 421; 58 L Ed 2d 387 (1978), and *Rawlings v Kentucky,* 448 US 98; 100 S Ct 2556; 65 L Ed 2d 633 (1980), "the two inquiries [of standing and of substantive Fourth Amendment protection] merge into one: whether governmental officials violated any legitimate expectation of privacy * * *". *Rawlings v Kentucky, supra,* 106.

A careful examination of the facts in this case assists in providing answers to this threshold question of expectation of privacy.

The defendant was in arrears on her rent. She did not live in the trailer. Personal items were removed. Defendant was living with her father but went back to the trailer periodically. She had two dogs with her and not at the trailer. Mrs. Nash permitted the Ballards to show the trailer to prospective renters. This constitutes abandonment and hence no expectation of privacy exists.

Mr. Ballard removed the box and placed it out-

side the trailer. The exact location was never clear. There was no testimony that the box was within the curtilage.

Mrs. Ballard, a citizen, initially made the gruesome discovery. Subsequently, she informed the sheriff and summoned him to the scene and gave him permission (consent) to search the box on the property. He did. The sheriff had no idea a crime had been committed until he looked inside. How can this be a search to obtain evidence of a crime when he did not even know a crime had been committed? Could Mrs. Ballard give valid consent to the search?

In examining the consent question, we apply *People v Chism,* 390 Mich 104, 130-132; 211 NW2d 193 (1973):

"This leads to the question of whether persons with at least equal interests in the premises or property with the one asserting the constitutional immunity against unreasonable searches and seizures may consent to a search of such premises or property * * *."

and further:

"There are four recent cases in which the United States Supreme Court has considered the matter of consent to a search by some one other than the defendant but a person who has some proprietary interest in the place and sometimes in the object searched or searched for. *Chapman v United States,* 365 US 610; 81 S Ct 776; 5 L Ed 2d 828 (1961), *Stoner v California,* 376 US 483; 84 S Ct 889; 11 L Ed 2d 856 (1964), *Bumper v North Carolina,* 391 US 543; 88 S Ct 1788; 20 L Ed 2d 797 (1968), *Frazier v Cupp,* 394 US 731; 89 S Ct 1420; 22 L Ed 2d 684 (1969)."

These four cases establish our guidelines. The question logically arises, did Mrs. Ballard have co-

equal interest with the defendant? To this, based on the facts in this case, I answer "yes".

Mrs. Ballard testified that she considered Mrs. Nash a tenant. Bear in mind that to say otherwise obviously destroys her ability to collect rent for the arrearage. Too much reliance is placed on a statement that is self-serving. Hence, we distinguish the *Chism, supra,* guidelines and conclude that Mrs. Ballard with a co-equal interest could give consent to the search which led to the discovery of the body. The Ballards were placed in a position of equality as to the trailer.

The case of *People v Benjamin,* 101 Mich App 637, 646-647; 300 NW2d 661 (1980), mirrors the consent argument when it states:

"We agree with the prosecution, for we find that, under the totality of the circumstances extant at the time the consent was obtained, such consent was given voluntarily, and the search was, therefore, valid. *People v Turner,* 62 Mich App 467, 470-473; 233 NW2d 617 (1975), *lv den* 395 Mich 799 (1975), *People v Ricky Smith,* 85 Mich App 32, 37, 46; 270 NW2d 697 (1978), see also *People v Reed,* 393 Mich 342, 360-366; 224 NW2d 867 (1975), *cert den* 422 US 1044, 1048; 95 S Ct 2660, 2665; 45 L Ed 2d 696, 701 (1975)."

I contend such is this case.

While consent is an exception to the warrant requirement, we must again digress and address the threshold question of expectation of privacy from *Rakas, supra,* as discussed in *People v Nabers,* 103 Mich App 354, 373-376; 303 NW2d 205 (1981):

"In *Rakas v Illinois,* 439 US 128; 99 S Ct 421; 58 L Ed 2d 387 (1978), the Supreme Court rejected traditional doctrines of standing vis-à-vis the Fourth Amendment in favor of an approach whereby a substantive analysis

of the rights of the person seeking suppression are examined relative to his legitimate expectation of privacy in the premises searched. (Footnotes omitted.)"

In the case at bar, it is clear what defendant's relationship to the trailer was. Some testimony suggests that defendant lived there, other testimony, from a number of disinterested witnesses, supports a contrary conclusion. The majority has little difficulty in concluding that defendant had a legitimate expectation of privacy from governmental intrusion if, in fact, she was the resident of the premises. Similarly, if the evidence adduced had shown that defendant was a casual visitor who entered the premises only seconds prior to the commencement of the search and who left seconds following the search, pursuant to *Rakas, supra,* 142, we would have to conclude that she had no legitimate expectation of privacy in the premises. In viewing the totality of the circumstances in this case, I determine that the defendant had no expectation of privacy. The facts clearly indicate partial, if not total, abandonment.

I find it hard to believe that defendant had no knowledge that the box was in the trailer when she left. Under these circumstances, the search without a warrant was reasonable.

However, after a careful review of the *Nabers, supra,* opinion, I find that Michigan follows a narrow *Rakas, supra,* approach. Citing *Nabers,* the opinion stated:

"The Supreme Court in *Rakas* strives to establish that opinion's essential consistency with previous decisions of the Court. *Rakas* can be interpreted either broadly or narrowly as either greatly restricting a petitioner's ability to assert a violation of his Fourth Amendment rights or as having a much more limited effect. The majority in *Rakas* forthrightly admits that

its decision renders no easier the determination to be made where there has been a motion to suppress. *Id.,* 140. In fact, *Rakas* further muddies the waters when suppression of evidence is in issue. See the majority and dissenting opinion in *People v Mack,* 100 Mich App 45; 298 NW2d 657 (1980)." *Nabers, supra,* 374.

and further:

"We note that the Michigan Supreme Court has not yet considered *Rakas.* The Michigan Supreme Court has traditionally afforded defendants greater protection against unreasonable searches and seizures than the United States Supreme Court. See, *People v Beavers,* 393 Mich 554; 227 NW2d 511 (1975), *cert den* 423 US 878; 96 S Ct 152; 46 L Ed 2d 111 (1975) (imposing higher Michigan standard relative to electronic surveillance); *People v Margelis,* 217 Mich 423; 186 NW 488 (1922) (applying the exclusionary rule prior to the time it was mandated by *Mapp v Ohio,* 376 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 [1961]). In our opinion there exists a fair possibility that our Supreme Court will reject or narrow the applicability of *Rakas* in Michigan as a matter of state constitutional law." *Nabers, supra,* 375.

I firmly believe in the time-honored principles that the fourth and Fourteenth Amendments afford our citizens. Searches without warrants are per se unreasonable and if the constable blunders, the evidence is suppressed. However, these principles should not be applied indiscriminately. These principles should be applied to the totality of the circumstances in each case. If a search without a warrant occurs, we must scrutinize the facts and ask ourselves the threshold question: "What reasonable expectation of privacy is by definition related to time, place and circumstance." *United States v Vicknair,* 610 F2d 372, 380 (CA 5, 1980). Considerable guidance is afforded by several Supreme Court cases. In short: the application of the

Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable", a "reasonable", or a "legitimate" expectation of privacy that has been invaded by government action. *E.g., Rakas.*

As I perceive the relevant principles, it devolves upon one seeking suppression of incriminating evidence to establish as a threshold matter the existence of a reasonable expectation of privacy in the area searched. *United States v Torch,* 609 F2d 1088, 1091 (CA 4, 1979). ("The test for whether a person may have evidence obtained in an unlawful search and seizure suppressed is whether the person had 'a reasonable expectation of freedom from government intrusion' in the invaded place.")

The recent case of *United States v Ramapuram,* 632 F2d 1149 (CA 4, 1980), addresses the issue of expectation of privacy. In *Ramapuram* it was held that defendant had no legitimate expectation of privacy in a junked automobile which had expired license plates, unlocked doors, and trunk lock removed, and which had been placed in an open field on a farm which his father owned; thus, warrantless removal of dynamite sticks from the trunk did not violate defendant's Fourth Amendment rights. The case is now pending in the United States Supreme Court. The test applied in determining expectation of privacy is to view the total circumstances. *United States v Dall,* 608 F2d 910, 914 (CA 1, 1979), *cert den* 445 US 918; 100 S Ct 1280; 63 L Ed 2d 603 (1980).

But *Ramapuram* adopted the principal of another federal case when it stated:

"('Ownership alone is not enough to establish a reasonable and legitimate expectation of privacy. Ownership is relevant to the inquiry * * *, but the total circumstances determine whether the one challenging

the search has a reasonable and legitimate expectation of privacy in the locus of the search.'); *United States v Rios,* 611 F2d 1335, 1345 (CA 10, 1979)." *Ramapuram, supra,* 1154.

I would urge adoption of the broad approach of *Rakas* and the determination of the expectation of privacy by the totality of the circumstances test.

I would affirm the lower court's ruling as not being in violation of the Fourth Amendment protections.

I concur with the majority that the question by the prosecuting attorney regarding the gun being found in the attorney's office is error. While defense counsel did not specifically object to the substantive portion of the question, it was definitely prejudicial to the defendant. The prejudice was of such a nature that it was detrimental to the defendant's case. The prosecutor may not accomplish by inference what he is clearly prohibited from doing by direct proof.

I also concur with the majority that defendant's attorney had a duty to relinquish evidence to the authorities and that he did not violate the defendant's attorney-client privilege by doing so.